**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

UNITED STATES OF AMERICA,

     v.

RYAN SAMSEL, *et al.*,

          Defendants.

Action No. 21-cr-537 (JMC)

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendants Ryan Samsel, James Grant, Paul Johnson, Stephen Randolph, and Jason Blythe are charged in a 15-count indictment for their conduct at the United States Capitol on January 6, 2021. ECF 245.[1] Mr. Grant pleaded guilty to counts fourteen and fifteen at trial. Following a seven-day bench trial, the Court renders the following verdicts for the remaining counts:

**Count One** (Obstructing Officers During a Civil Disorder, 18 U.S.C. § 231(a)(3)): The Court finds Mr. Samsel, Mr. Grant, Mr. Johnson, Mr. Randolph, and Mr. Blythe **GUILTY**.

**Count Two** (Assaulting, Resisting, or Impeding Officer C.E.[2] Using a Deadly/Dangerous Weapon, Inflicting Bodily Injury, 18 U.S.C. §§ 111(a)(1), (b)): The Court finds Mr. Samsel and Mr. Randolph **GUILTY**. The Court finds Mr. Grant, Mr. Johnson, and Mr. Blythe **NOT GUILTY**.

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this order, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

[2] C.E. was an officer at the time of the events giving rise to Defendants' charges. She has since been promoted to the rank of sergeant. ECF 317 at 22:15–23:6. The Court will refer to her as Sgt. C.E. throughout the remainder of this order.

**Count Three** (Assaulting, Resisting, or Impeding Officer D.C Using a Deadly/Dangerous Weapon, Inflicting Bodily Injury, 18 U.S.C. §§ 111(a)(1), (b)): The Court finds Mr. Grant, Mr. Johnson, and Mr. Blythe **GUILTY**. The Court finds Mr. Samsel and Mr. Randolph **NOT GUILTY**.

**Count Four** (Assaulting, Resisting, or Impeding Officer D.C., Physical Contact or Intent to Commit Another Felony, 18 U.S.C. § 111(a)(1)): The Court finds Mr. Randolph **GUILTY**.

**Count Five** (Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. §§ 1752(a)(1), (b)(1)(A)): The Court finds Mr. Samsel, Mr. Grant, Mr. Johnson, Mr. Randolph, and Mr. Blythe **NOT GUILTY**.

**Count Six** (Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. §§ 1752(a)(2), (b)(1)(A)): The Court finds Mr. Samsel, Mr. Grant, Mr. Johnson, Mr. Randolph, and Mr. Blythe **NOT GUILTY**.

**Count Seven** (Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon or Resulting in Significant Bodily Injury, 18 U.S.C. §§ 1752(a)(4), (b)(1)(A), (b)(1)(B)): The Court finds Mr. Samsel, Mr. Grant, Mr. Johnson, Mr. Randolph, and Mr. Blythe **NOT GUILTY**.

**Count Eight** (Disorderly Conduct in the Capitol Grounds or Buildings, 40 U.S.C. § 5104(e)(2)(D)): The Court finds Mr. Samsel, Mr. Grant, and Mr. Johnson **GUILTY**. The Court finds Mr. Randolph and Mr. Blythe **NOT GUILTY**.

**Count Nine** (Act of Physical Violence in the Capitol Grounds or Buildings, 40 U.S.C. § 5104(e)(2)(F)): The Court finds Mr. Samsel, Mr. Grant, Mr. Johnson, Mr. Randolph, and Mr. Blythe **GUILTY**.

**Count Ten** (Obstruction of an Official Proceeding, 18 U.S.C. § 1512(c)(2)): The Court finds Mr. Samsel, Mr. Grant, and Mr. Johnson **GUILTY**. The Court finds Mr. Randolph and Mr. Blythe **NOT GUILTY**.

**Count Eleven** (Obstructing Officers During a Civil Disorder, 18 U.S.C. § 231(a)(3)): The Court finds Mr. Samsel **GUILTY**.

**Count Twelve** (Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1)): The Court finds Mr. Samsel **GUILTY**.

**Count Thirteen** (Assaulting, Resisting, or Impeding Certain Officers Using a Deadly/Dangerous Weapon, 18 U.S.C. §§ 111(a)(1), (b)): The Court finds Mr. Samsel **GUILTY**.

Pursuant to Federal Rule of Criminal Procedure 23(c), the Court's specific findings are as follows.

## I.  FINDINGS OF FACT

At trial, the Court received testimony from 14 witnesses, including four United States Capitol Police (USCP) officers who were working at the Capitol on January 6, 2021: Lt. George McCree, Sgt. T.L., Sgt. C.E., and Officer D.C. The Court also heard from two Metropolitan Police Department (MPD) officers, Sgt. Luke Foskett and Capt. David Augustine, who were deployed to the Capitol on January 6th to reinforce the USCP. Additionally, the Court heard testimony from five FBI Special Agents who assisted in the investigation of this case: Special Agent Steward Curcio, Special Agent Craig Noyes, Special Agent Desirae Maldonado, Special Agent Kacy Jones, and Special Agent James Farris. Finally, the Court admitted into evidence transcripts of trial testimony from Inspector Lanelle Hawa of the United States Secret Service, *United States v. Griffin*, 1-21-cr-00092-TNM, *see* Gov. Ex. 1201; Daniel Schwager of the Office of the General

Counsel to the Secretary of the United States Senate, *United States v. Kelly*, 1-21-cr-00708-RCL, *see* Gov. Ex. 1202; and Edgar Tippett, a district manager for Safeway Stores, Inc., *United States v. Parker*, 1-21-cr-00028-APM, *see* Gov. Ex. 1203.

The Court also admitted 167 exhibits into evidence, almost half of which were audio or video recordings, including third-party "open-source" videos. Many of these open-source videos were the subject of defense objection at trial. In reaching these verdicts, the Court relied upon the audio or video recordings cited in this order. Generally, the recordings upon which the Court relied fall into one of four categories. First, the Court relied on certain USCP closed-circuit video recordings and MPD body-worn officer camera footage, to which the Parties stipulated. Second, the Court has based its findings on some of the third-party, open-source videos for which a witness who was present at the scene of the events depicted testified to confirm that the videos were, in fact, a fair and accurate representation of the events depicted. Third, the Court has cited to other third-party, open-source videos for which a testifying witness was not present for the events depicted in the recordings, but the Court has nonetheless concluded that other strong indicia of reliability establish that these videos were taken at the Capitol on January 6th and accurately reflect Defendants' conduct. Finally, the Court relied on certain video footage extracted from Mr. Samsel's cell phone.

After considering this evidence, the Court makes the following factual findings.

### A. Security Preparations at the Capitol for the Certification of the Electoral College Vote

On January 6, 2021, Congress was scheduled to convene a joint session to certify the Electoral College votes for the 2020 presidential election. *See* ECF 314 at 8:8–15. The Capitol building and its grounds were closed to the public. *See id.* at 8:23–10:22. In advance of the joint session, the USCP received intelligence that there would be a large demonstration outside the

Capitol that day and thus instituted extra security measures, including by establishing a secure perimeter around the Capitol grounds. *Id.* at 9:8–10:8; *see* also Gov. Ex. 5 (aerial map with an outline illustrating the restricted perimeter around the Capitol building and grounds).

To establish the secure perimeter, the USCP erected barricades around the Capitol. ECF 314 at 10:9–25. These barricades consisted of metal bicycle racks that were linked together. ECF 322 at 59:6–60:7. Trial witnesses estimated that each, individual bicycle rack weighed anywhere from 25 pounds (on the low end) to 50 pounds (on the high end). *See* ECF 315 at 63:23–25; ECF 317 at 117:9–11. The bicycle racks were reinforced by zip ties and snow fencing so that they could not be easily pulled apart. ECF 315 at 75:3–7. The USCP set up one of these barricades on the sidewalk across from Peace Circle, a traffic circle at the end of Pennsylvania Avenue on the northwest side of the Capitol grounds. ECF 317 at 24:21–26:5, 28:10–29:4. A second barricade blocked off the Pennsylvania Walkway, a footpath running from Peace Circle to the West Plaza of the Capitol building. ECF 315 at 66:7–13, 74:10–22. It was positioned at the base of a staircase and bore signs reading "Area Closed By Order of the United States Capitol Police Board." *See id.* at 25:1–20, 74:10–22; Gov. Ex. 4.

In addition to the metal barricades, members of the USCP's Civil Disturbance Unit stationed themselves along the West Front of the Capitol, including at the sidewalk near Peace Circle and on the Pennsylvania Walkway, to establish a perimeter around the Capitol grounds. ECF 315 at 64:17–66:9. By about 12:40 P.M., five USCP officers, including Sgt. C.E. and Officer D.C., were stationed at the top of the staircase on the Pennsylvania Walkway, behind the second barricade. Gov. Ex. 201 at 0:01; *see also* ECF 315 at 75:18–23; ECF 317 at 30:6–19. Their supervisor, Sgt. T.L., was positioned on a lawn near the base of the staircase. ECF 315 at 64:4–65:18, 76:8–17. Collectively, these measures were aimed to keep demonstrators away from the

Capitol, *id.* at 10:2–8, and to protect Vice President Michael Pence, who was presiding over the certification proceeding, *id.* at 11:8–12:21.

Vice President Pence called the joint session to order around 1:00 P.M. *See* Gov. Ex. 1202 at 182:24–183:3. But shortly after that, the Secret Service learned that a mob of people had broken through the barricades on the west side of the Capitol grounds. Gov. Ex. 1201 at 219:18–220:20. To ensure the Vice President's safety, the Secret Service escorted him from the Senate chamber to his ceremonial office. *Id.* Shortly after 2:00 P.M., people continued to breach Capitol grounds, with some making their way into the building, forcing the Capitol into lockdown and halting the certification process. *See id.* at 224:16–225:1; ECF 314 at 27:11–28:20, 30:14–31:1.

## B. The Breach of Peace Circle

Mr. Samsel, Mr. Grant, Mr. Johnson, Mr. Randolph, and Mr. Blythe were among the group that breached the Capitol grounds and interrupted the certification proceeding.

Around 12:45 P.M., shortly before the Vice President started the joint session, dozens of people were gathered outside the barricade at Peace Circle. Gov. Ex. 201 at 5:00. Minutes later, the crowd was in the hundreds. *Id.* at 12:00. Mr. Johnson was in this crowd. He wore camouflage pants, a black zip-up hoodie, and a black hat with writing on it. ECF 318 at 95:4–12. He also carried a black megaphone, *id.*, which was later recovered from his home, *id.* at 110:23–111:23. Mr. Johnson used his megaphone to encourage the crowd to "get on the front lines" and to "1776 this fence right here," referring to the barricade. Gov. Ex. 304.[3]

[3] Although Mr. Johnson stipulated to his identity in third-party videos, he objected to the Court considering any audio. The Court nonetheless relies on the cited videos, including the accompanying audio, because Agent Maldonado, the FBI agent who investigated Mr. Johnson's case, identified Mr. Johnson and his voice. ECF 318 at 95:20-96:5, 106:9 24–117:24 (Agent Maldonado identifying Mr. Johnson as the individual who is speaking in Gov. Exs. 304, 309, 320, 334, and 340, and who is visible in Gov. Exs. 304, 319, 334, and 340). She testified that she became familiar with Mr. Johnson's voice because she had conversations with him in connection with her investigation. *Id.* at 94:5–95:2. She was thus able to confirm that the audio in the videos was Mr. Johnson's voice, as opposed to someone else's. *See, e.g., id.* at 107:22–108:5. The Court credits Agent Maldonado's testimony. Further, the voice the Government attributes to

### i.   *Defendants Enter the Restricted Area*

Around 12:53 P.M., Mr. Samsel bypassed the first barricade and walked toward the second. Gov. Ex. 201 at 13:14–13:21; Gov. Ex. 204 at 13:12–13:18. He wore a black short-sleeve shirt over a white long-sleeve shirt, light colored sweatpants, and a red "Make America Great Again" hat. ECF 318 at 135:23–136:24. He also wore a blue jean jacket, which he took on and off during his time at the Capitol. *See id.* at 136:25–137:2.

Mr. Grant followed closely behind Mr. Samsel through the first barricade. Gov. Ex. 201 at 13:16–22. He waived the crowd forward onto the Pennsylvania Walkway and toward the USCP officers. *Id*. Mr. Grant wore a black jacket, dark sweatpants, black Nike shoes, a hat with a North Carolina emblem on it, and a skull gaiter mask. ECF 318 at 22:7–14. Moments after Mr. Grant and Mr. Samsel passed the first barricade, the crowd followed, toppling the barricade and pressing onto Capitol grounds. Gov. Ex. 204 at 13:14–20.

Immediately upon seeing the crowd breach the first barricade, the five USCP officers stationed on the Pennsylvania Walkway came down the stairs to reinforce the second one. ECF 317 at 113:10–19; Gov. Ex. 201 at 13:00–13:20. Sgt. T.L. moved from his position on the lawn to assist them. ECF 315 at 78:23–80:1.

The events that followed were captured on CCTV footage and third-party, open-source videos that the Court referred to earlier. Over Defendants' objection, the Court relies on the following open-source videos in making its factual findings here: Government Exhibits 302, 304, 308, 308A, 309, 332, and 340. One or more USCP officers testified that they were on the scene of

---

Mr. Johnson sounds the same across videos, so the Court concludes that it is coming from the same person (Mr. Johnson). Moreover, a black megaphone—consistent with the one Mr. Johnson can be seen holding at the Capitol—was recovered from Mr. Johnson's home. *Id.* at 110:23–111:23. Additionally, Sgt. T.L. testified that the background features of these videos accurately reflect what the Capitol looked like on January 6th, further confirming that the footage was, in fact, taken on Capitol grounds that day. *See* ECF 315 at 191:5–196:2 (testifying about Gov. Exs. 319, 320, 334, 335, 339); *see also id.* at 86:21–87:8 (testifying about Gov. Ex. 340).

the events depicted in these videos and confirmed that each video was a fair and accurate recording of the events at Peace Circle and on the Pennsylvania Walkway.

As the crowd came up to the second barricade, Mr. Johnson yelled for the USCP officers to move and told them, "It's our house. We pay your bills" Gov. Ex. 302 at 0:16–0:23. Others in the crowd chanted, "Stop the steal." Gov. Ex. 308 at 0:09–0:12. At this point, Mr. Randolph and Mr. Blythe had also passed the first barricade and were standing near the second one. *See id.* at 0:22 (Mr. Randolph); *id.* at 0:26 (Mr. Blythe). Mr. Randolph was wearing a black jacket, a gray Carhartt beanie, dark boots, and black gloves with an orange border around the wrists. ECF 318 at 75:18–23, 81:1–18. Mr. Blythe was wearing a green helmet with the Texas flag on it and a camouflage jacket, ECF 322 at 118:14–119:12, as well as soft body armor, ECF 322 at 92:1–93:14.

Mr. Samsel approached Officer D.C. at the second barricade. ECF 317 at 118:12–17. Officer D.C. told Mr. Samsel that the area was closed and he could not enter it. ECF 317 at 118:22–24. Mr. Samsel then tried to pull the bicycle racks away from the officers and toward the crowd, but Officer D.C. was able to hold the racks in place. Gov. Ex. 302 at 0:30–0:33. Mr. Samsel let go of the barricade, ripped off his jacket, and turned his hat around. *Id.* at 0:33–0:42; *see also* ECF 317 at 119:18–120:4.

### ii. *Assault of Sgt. C.E.*

At this point, Sgt. C.E. was standing on the far right[4] side of the second barricade. Gov. Ex. 308A at 0:06; *see also* ECF 317 at 38:2–8. She stood between two bicycle racks and held onto both to keep them upright. ECF 317 at 38:7–39:4. Officer D.C. stood at the juncture of two bicycle racks to Sgt. C.E.'s left. Gov. Ex. 302 at 0:40–0:57, ECF 315 at 115:2–11. Sgt. T.L. was positioned

---

[4] The "left" and "right" sides of the barricades are described from the perspective of an individual facing the second barricade and the USCP officers. This is the same perspective shown in many of the third-party videos that the Court cites herein.

at the middle of the bicycle rack to Officer D.C.'s left. Gov. Ex. 302 at 0:40–0:57; ECF 315 at 115:2–1.

Mr. Randolph was standing in front of the barricade, face-to-face with Sgt. C.E. Gov. Ex. 302 at 0:50–0:55; Gov. Ex. 308 at 0:35–0:40. He began pushing the bicycle rack into her. Gov. Ex. 302 at 0:50–0:55; Gov. Ex. 308 at 0:35–0:40. He rammed the bicycle rack toward her several times, moving Sgt. C.E. backward as she tried to keep the bicycle rack upright. Gov. Ex. 302 at 0:50–0:55; ECF 317 at 39:9–40:2. Seconds later, Mr. Samsel joined Mr. Randolph. Together, they pushed the bicycle rack into Sgt. C.E. Gov. Ex. 302 at 0:55–0:57; Gov. Ex. 308 at 0:38–45. They lifted the bicycle rack off the ground and struck Sgt. C.E. in the face with it, hitting her left cheek. ECF 317 at 42:7–43:12; *see also* Gov. Ex. 308A 0:25–37. The force of the bicycle rack hitting her face knocked her back toward the stairs. ECF 317 at 44:3–8; Gov. Ex. 308A at 0:30–0:40. When she fell, she struck her head twice: first, on the handrail of the stairs and, second, when she fell to the ground and the back of her skull hit the steps. Gov. Ex. 308 at 0:44–46; ECF 317 at 44:12–45:10. Sgt. C.E. immediately passed out and suffered pain, dizziness, blurred vision, and further loss of consciousness later that day. ECF 317 at 43:15–17, 55:22–57:10. She was ultimately hospitalized. *Id.* at 58:14–59:22.

### iii.   *Assault of Officer D.C.*

Mr. Grant, Mr. Johnson, and Mr. Blythe also tried to get beyond the second barricade and the line of officers that formed to reinforce it. Each lifted the bicycles racks off the ground, raised them in the air, and used them to push Officer D.C. Gov. Ex. 302 at 0:55–1:02; Gov. Ex. 332 at 0:30–0:37. Defendants' force on the bicycle racks drove Officer D.C. back against the stairs. Gov. Ex. 332 at 0:30–0:37; ECF 317 at 123:23–124:5.

After this, Mr. Randolph jumped over the second barricade. Gov. Ex. 332 at 0:37–0:40; Gov. Ex. 302 at 1:04–1:09. He moved straight at Officer D.C. and grabbed him with both hands. ECF 317 at 126:8–17; *see also* Gov. Ex. 302 at 1:04–1:09. Officer D.C. was eventually able to pull away from Mr. Randolph, but only after Sgt. T.L. and another officer intervened to help. *See* Gov. Ex. 302 at 1:13–1:17; ECF 315 at 118:5–14; ECF 316 at 51:5–19.

By 12:55 P.M., the rioters had overwhelmed the USCP officers, knocked down the second barricade, and rushed toward the Capitol building. Gov. Ex. 204 at 14:00–15:00. At that point, the police line had been breached and the USCP officers had to abandon the barricades to try and establish another police line closer to the Capitol building. ECF 315 at 119:17–20. The USCP officers retreated to the West Plaza, *id.* at 126:25–127:5, and were eventually reinforced by MPD officers, who established a new defensive line, *see id.* at 160:1–3, 166:21–167:20.

## C. Defendants' Additional Conduct on January 6th

Following the breach, all five Defendants remained on the Capitol grounds. The Court recounts their conduct below.

Mr. Johnson made his way to the Lower West Terrace, where he used his megaphone to tell the crowd, "They certified the vote. You going to stand around and watch now?" and "They just stole it." Gov. Ex. 334 at 0:18–0:31. While claiming the vote was stolen, Mr. Johnson implored other rioters to check their phones and social media. Gov. Ex. 320 at 0:28–0:32; Gov. Ex. 334 at 0:50–0:59. He told the crowd, "We need to push this shit down," Gov. Ex. 320 at 0:33–37; Gov. Ex. 334 at 0:59–1:02, and asked them to raise their voices because "they're debating because they're scared now," Gov. Ex. 319 at 0:23–0:27.

Mr. Grant entered the Capitol building through a broken window next to the Senate Wing door at 2:49 P.M. Gov. Ex. 206 at 0:49–0:53. While inside, he went into sensitive areas and posed for photographs in a congressional office. *See* Gov. Ex. 1102D; Gov. Ex. 1102C.

Mr. Randolph remained on the Capitol grounds for hours; he was pictured on the Upper West Terrace at 3:37 P.M. Randolph Ex. 2 at 0:10–0:22.

Mr. Blythe also stayed on the grounds for hours and travelled to the Upper West Terrace, where MPD officers had to forcibly remove him from an elevated wall after he (and other rioters) refused to clear the area. *See* ECF 322 at 90:17–91:6.; Gov. Ex. 403 at 2:20–3:28.

Mr. Samsel had multiple skirmishes with officers on the Capitol grounds. At 1:13 P.M., he was lingering near the MPD's police line on the Upper West Terrace with a flag in his hand. Gov. Ex. 408 at 0:05–0:12; *see also* ECF 315 at 169:15–18. At 1:37 P.M., Mr. Samsel approached the police line and yelled in officers' faces. Gov. Ex. 408 at 0:07–0:10. One of the MPD officers pushed Mr. Samsel away, but Mr. Samsel continued to accost the officers. *Id.* at 0:10–0:33. He waved his flag in the officers' faces, *id.* at 0:47–0:55, prompting the officers to deploy a chemical spray at him, *id.* at 0:57–1:05. In response, Mr. Samsel choked up on his flagpole and swung it toward the police line, *id.*, simulating striking the officers multiple times, Gov. Ex. 307 at 1:03–1:12.[5]

Later, at 1:57 P.M., Mr. Samsel threw a 2x4 plank of wood at the line of MPD officers stationed on the West Plaza. *See* Gov. Ex. 324 at 0:20; Gov. Ex. 338 at 0:01. The MPD officers

---

[5] The Court relies on Government Exhibit 307 to support its findings for multiple reasons. First, Government Exhibit 307 appears to show the same, or a substantially similar, scene as Government Exhibit 408, which is bodycam footage to which the Parties stipulated. Specifically, Mr. Samsel's outfit, his flag with its white flagpole, the crowd's chants of "Whose house? Our house!," and the background features of the Capitol depicted in Government Exhibit 408 are the same as what is reflected in Government Exhibit 307. Even Mr. Samsel's conduct—simulating striking officers with his flagpole and turning around when sprayed with chemicals—is the same between the law enforcement footage and the open-source video. Thus, the Court has no trouble relying on Government Exhibit 307 and concluding that it accurately depicts the events at the Capitol on January 6th, including Mr. Samsel's conduct.

were in place to try and hold back a crowd that was on the Capitol lawn. ECF 322 at 143:24–144:4. As the plank flew overhead, one of the officers ducked to avoid being struck. ECF 322 at 158:20–24. This moment was captured in multiple videos, including in CCTV and officer bodycam footage. *See* Gov. Ex. 202 at 0:16–0:19; Gov. Ex. 203 at 6:44–7:08; Gov. Ex. 410 at 0:11–0:14; Gov. Ex. 412 at 1:30–1:52. Given Mr. Samsel's clothing, *see infra* Section I(B)(i), which makes him readily identifiable, the Court has no doubt that Mr. Samsel was the person who threw this plank of wood.[6]

Mr. Samsel also got into a physical altercation with a USCP officer on the Southwest Plaza. He attempted to rip a riot shield out of a USCP officer's hands while other rioters were yelling at and shoving police officers. Gov. Ex. 314 at 2:55–3:10; *see also* ECF 315 at 146:24–147:2. He grabbed the shield with both hands and pulled it toward the ground, which exposed the officer's head and torso to the crowd. Gov. Ex. 314 at 3:02–3:10.[7]

While on Capitol grounds, Mr. Samsel recorded himself saying, "We breached the Capitol!" Gov. Ex. 1103B. He endorsed his conduct in text messages sent later that night and in the days following. Mr. Samsel told people "Dude no shit I started it," Gov. Ex. 1103R, and that he "br[oke] through the lines," Gov. Ex. 1103T. He said that he "got hit with gas a few times" but it was "worth it lol." Gov. Ex. 1103S. Mr. Samsel also sent numerous people a screenshot of a

---

[6] Government Exhibit 324 shows Mr. Samsel with the plank in his hand, wearing the same clothes as pictured in the CCTV footage, and standing in the inaugural scaffolding. *See* Gov. Ex. 324 at 0:18–0:30. The person in the CCTV video who threw the plank was shown walking away from the scaffolding just before throwing the plank. *See* ECF 322 at 155:4–24. Government Exhibit 338 shows a close-up of Mr. Samsel's arm as he throws the plank—his white long-sleeve shirt and jean jacket are unmistakable. Gov. Ex. 338; ECF 322 at 157:17–158:13 (Gov. Ex. 338 showing the same incident as Gov. Ex. 410). The Court finds that these third-party videos accurately reflect Mr. Samsel's conduct on January 6th because of their overlap with CCTV and bodycam footage depicting the moment the plank was thrown.

[7] Numerous third-party videos show this event. *See, e.g.*, Gov. Ex. 314 at 2:55–3:10; Gov. Ex. 316 at 24:50–56; Gov Ex. 330 at 1:45–1:55. Sgt. T.L., who was standing nearby during the conflict, identified himself in these videos and testified that they accurately depicted the events that occurred on the Southwest Plaza on January 6th. See ECF 315 at 146:19–152:17 (Sgt. T.L. authenticating Gov. Ex. 314, 316, 321, 330). Given Sgt. T.L.'s proximity to the events shown, the Court credits Sgt. T.L.'s testimony and relies on these third-party videos to support its findings.

New York Times article that showed an image of him grabbing the officer's riot shield, and bragged "I'm on cover of time mag I was first one over bro everybody followed me we went nuts lol." Gov. Ex. 1103W.

*   *   *

The presence of Defendants and other rioters at the Capitol prevented Congress from performing its official business. Each unauthorized person at the Capitol presented a security risk, and Congress could not proceed until the grounds were clear. *See* Gov. Ex. 1201 at 224:8–225:6. This process took hours, *see* Gov. Ex. 1201 at 225:9–226:3, and Congress was unable to reconvene the joint session until 8:06 P.M., *see* Gov. Ex. 1202E at S18. As a result, the 2020 election was not certified until early the next morning. *Id.* at H115.

## II.   FINDINGS ON THE ELEMENTS OF THE CHARGED COUNTS

### A.   COUNT ONE

Count one charges each Defendant with obstructing, impeding, or interfering with USCP officers during a civil disorder, and aiding and abetting others to commit that crime, in violation of 18 U.S.C §§ 231(a)(3), 2. The Court previously articulated the elements and relevant definitions for this offense in its legal instructions. ECF 313. First, the Government must prove beyond a reasonable doubt that each Defendant knowingly committed, or attempted to commit, an act with the intended purpose of obstructing, impeding, or interfering with a law enforcement officer. *See* 18 U.S.C. § 231(a)(3). Second, the Government must prove that, at the time of each Defendant's conduct, the law enforcement officer was "lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder." *Id.* Finally, the Government must prove that the civil disorder "obstruct[ed], delay[ed], or adversely affect[ed] . .

. commerce or the movement of any article or commodity in commerce, or the conduct or performance of any federally protected function." *Id.*

    After carefully considering the evidence presented at trial, the Court finds that the Government has satisfied its burden for each Defendant. Accordingly, the Court finds Mr. Samsel, Mr. Grant, Mr. Johnson, Mr. Randolph, and Mr. Blythe GUILTY of count one.

    **i.**    ***Defendants Knowingly Obstructed, Impeded, or Interfered with a Law Enforcement Officer***

    Defendants' conduct is captured on video. Each Defendant, along with many others, breached a barricade that had been set up across from Peace Circle and approached a second barricade that was established at the bottom of the stairs on the Pennsylvania Walkway. *See, e.g.*, Gov. Ex. 201 at 13:14–13:21; Gov. Ex. 204 at 13:12–13:14; Gov. Ex. 302 at 0:03–0:05; Gov. Ex. 308 at 0:22; Gov. Ex. 309 at 0:31–043. These barricades consisted of metal bicycle racks that were linked together. *See infra* Section I(A).

    Before Defendants bypassed the first barricade, a group of USCP officers, including Sgt. C.E. and Officer D.C., had been positioned at the top of the stairs on the Pennsylvania Walkway. Gov. Ex. 201 at 9:54. The officers came down the stairs to form a police line as they saw the crowd (which included each Defendant) approaching. *See* Gov. Ex. 201 at 13:05–13:15; *see also* ECF 317 at 113:10–19; *id.* at 39:21-40:2. Sgt. T.L. joined these officers to help prevent the crowd from getting past the second barricade. *See* ECF 315 at 78:23–80:2.

    The Court finds that each Defendant knowingly and purposely engaged in conduct to obstruct, impede, and interfere with the USCP officers who were trying to establish a police line and prevent the crowd from breaching the second barricade. The barricade had signs on it that read "Area Closed," ECF 317 at 35:20–36:3; *see also* Gov. Ex. 302 at 0:11–0:14; Gov. Ex. 4, and USCP officers tried to hold it in place to prevent Defendants (and other crowd members) from getting

past it, *see, e.g.*, Gov. Ex. 302 at 0:50–1:00; ECF 317 at 39:16–40:2, 120:25–121:11. Officer D.C. told Mr. Samsel he could not enter the restricted area. ECF 317 at 118:12–24. Officers formed a line to prevent the crowd from entering the area, but Mr. Johnson, and other rioters, demanded that they move out of the way. Gov. Ex. 302 at 0:16–0:23. Despite literal and repeated signs that they should not proceed further onto Capitol grounds, Defendants pushed on the bicycle racks and shoved them into officers. *See infra* Sections I(B)(ii)–(iii). Ultimately, the barricade fell, Gov. Ex. 204 at 14:00–15:00, and each Defendant entered a closed area that USCP officers were obviously trying to keep them out of.

In short, USCP officers were blocking an area that Defendants wanted to enter, so Defendants knocked the barricade (and some of the officers) out of their way. That knowing, intentional, and purposeful conduct easily satisfies the first element of this offense.

### ii. *USCP Officers Were Lawfully Engaged in the Lawful Performance of Their Duties During the Commission of a Civil Disorder*

The Court finds that the Government has proven the second element of this offense beyond a reasonable doubt. As on-duty members of the USCP's Civil Disturbance Unit, Sgt. C.E., Officer D.C., and other officers who formed the police line at the second barricade, were clearly "officer[s] . . . of the United States," 18 U.S.C. § 232(7), "engaged in the lawful performance of [their] official duties," 18 U.S.C. § 231(a)(3), as they attempted to prevent Defendants (and others) from entering the cordoned-off area.

The Court also finds that Defendants committed their acts "incident to and during the commission of a civil disorder." 18 U.S.C. § 231(a)(3). As the Court previously recognized, *see* ECF 313 at 4, the term "civil disorder" means any public disturbance involving acts of violence by groups of three or more persons that (a) causes an immediate danger of injury to another individual, (b) causes an immediate danger of damage to another individual's property, (c) results

in injury to another individual, or (d) results in damage to another individual's property, 18 U.S.C. § 232(1). The five Defendants were part of a larger group of individuals who ultimately knocked over the second barricade. Gov. Ex. 308 at 0:36–0:47; Gov. Ex. 309 at 1:00–1:30. Defendants' actions in pushing portions of the metal barricade into USCP officers constitutes an assault against the affected officers. The assault caused immediate danger of injury to Officer D.C. and to the other USCP officers who were attempting to guard the Capitol grounds. *See* ECF 317 at 122:19–24. Sgt. C.E. was, in fact, seriously injured after being struck in the face with a portion of the bicycle rack and knocked to the ground. *See supra* Section II(B)(ii). Accordingly, the Court disagrees with Mr. Grant, Mr. Johnson, and Mr. Randolph's argument at trial that to the extent they interfered with any USCP officer by pushing down the barricade, they did so before any civil disorder began. Defendants' actions in assaulting USCP officers with metal bicycle racks form a basis for the civil disorder charge, not something that occurred prior to any civil disorder.

### iii.     *Defendants' Conduct Impacted Commerce or a Federally Protected Function*

Finally, the Court finds that Defendants impacted the performance of a federally protected function. A "federally protected function" is any "function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof." 18 U.S.C. § 232(a)(3); *see also* ECF 313 at 4. The USCP is an instrumentality of the United States and, for the reasons described above, the officers who formed a line at the second barricade were attempting to exercise their duties to maintain order and keep a mob of people out of the restricted areas of the Capitol. ECF 317 at 39:18–40:2; *see*

*also* ECF 315 at 78:23–80:2. Defendants' conduct described above impacted the officers' ability to carry out their functions.[8]

Thus, each Defendant is GUILTY of count one. Given the Court's findings, the Court need not also consider whether any Defendant aided and abetted others in committing this offense.

## B. COUNT TWO

Count Two charges each Defendant with assaulting, resisting, or impeding Sgt. C.E. using a dangerous weapon, or aiding and abetting others in committing that offense, in violation of 18 U.S.C. §§ 111(a)(1), (b), 2. At trial, the Government sought to prove that Defendants assaulted Sgt. C.E. with metal bicycle racks, significantly injuring her. To convict Defendants of this crime, the Government must prove the following elements beyond a reasonable doubt: First, the Government must prove that Defendants assaulted, resisted, opposed, impeded, intimidated, or interfered with Sgt. C.E. *See United States v. Arrington*, 309 F.3d 40, 44 (D.C. Cir. 2002). Second, the Government must establish that Defendants did so forcibly. *Id.* Third, the Government must prove that Defendants engaged in the charged conduct voluntarily and intentionally. *Id.* Fourth, the evidence must establish that Sgt. C.E. was a designated officer of the United States engaged in the performance of her official duties at the time of the offense. *Id.* at 43 n.2. Finally, the Government must prove beyond a reasonable doubt that Defendants intentionally used a dangerous weapon against or inflicted bodily injury on Sgt. C.E. *See id.* at 44–45. Using a dangerous weapon against or inflicting bodily injury on an officer subjects a defendant to an enhanced penalty under the statute. 18 U.S.C. § 111(b).

---

[8] The Court would also find an impact on commerce. The Parties stipulated to the admissibility of testimony from Edgar Tippett, a district manager for Safeway Stores. Gov. Ex. 1203 (testimony from *United States v. Parker*, 1-21-cr-00028-APM). According to Mr. Tippett, Safeway Stores in Washington D.C. had to close because of a city-wide curfew that the mayor enacted. Gov. Ex. 1203 at 3319:11–3320:9. The Parties further stipulated that the curfew was enacted "because of what the mayor asserted was a civil disorder occurring at the United States Capitol on January 6th of 2021." Gov. Ex. 1204 at 3. Evidence presented at trial established that the forced closure resulted in the loss of revenue to Safeway. *See* Gov. Ex. 1203B. The Court credits this evidence.

The Court finds that the Government has proven each of these elements beyond a reasonable doubt for Mr. Samsel and Mr. Randolph and thus finds both Defendants GUILTY of count two. However, the Court finds that each element of the offense has not been satisfied for the remaining Defendants and finds Mr. Grant, Mr. Johnson, and Mr. Blythe NOT GUILTY of count two.

### i.  *Mr. Samsel and Mr. Randolph Are Guilty of Count Two*

The Court begins by explaining its reasons for convicting Mr. Samsel and Mr. Randolph, considering each element of the offense in turn.

#### 1.  *Defendants Assaulted, Resisted, or Impeded Sgt. C.E.*

The Court finds that Mr. Samsel and Mr. Randolph assaulted, resisted, opposed, impeded, and interfered with Sgt. C.E. Video evidence and sworn testimony presented at trial established that both Defendants lifted a metal bicycle rack off the ground and attacked Sgt. C.E. with it. Gov. Ex. 302 at 0:50–1:00; Gov. Ex. 308 at 0:35–0:45; ECF 317 at 39:9–40:11, 41:8–18. Defendants lifted the rack high enough, and shoved it with enough force, to strike Sgt. C.E. in her face. Gov. Ex. 308 at 0:44–0:47; ECF 317 at 42:6–14. The impact caused Sgt. C.E. to stumble backward, but Mr. Randolph and Mr. Samsel kept pushing the bicycle rack into her. ECF 317 at 42:9–11. They used the rack to knock her over, which caused her to hit her jaw on a metal handrail, lose consciousness, fall to the ground, and hit her head on the stairs. Gov. Ex. 308A at 0:37–0:40; ECF 317 at 42:6–14. Striking and pushing a person, with an object or otherwise, is an assault by any definition. *See* ECF 313 at 10 (Court's legal instructions defining assault as an intentional attempt to "inflict injury upon someone else, when coupled with an apparent present ability to do so," and recognizing that an injury includes "a touching offensive to a person of reasonable sensibility"). And for the reasons the Court articulated in rendering its verdict on count one, Mr. Samsel and

Mr. Randolph also resisted, opposed, impeded, and interfered with Sgt. C.E. She was trying to reinforce a police line and hold the bicycle racks in place to keep Defendants (and others) out of an area that was closed to them, and Defendants successfully prevented her from doing so. *See infra* II(A); *see also* ECF 317 at 39:20–40:11.

### 2.   *Defendants Committed the Prohibited Conduct Forcibly*

A defendant does not violate this statute unless he commits the prohibited acts "forcibly." *Arrington*, 309 F.3d at 44 (citing *United States v. Heid*, 904 F.2d 69, 71 (D.C. Cir. 1990)). Mr. Samsel and Mr. Randolph used physical force when they struck and pushed Sgt. C.E. with a metal bicycle rack. The Court thus finds that the Government proved this element of the offense beyond a reasonable doubt.

### 3.   *Defendants Committed Their Conduct Voluntarily and Intentionally*

The Court also finds beyond a reasonable doubt that Mr. Samsel's and Mr. Randolph's actions against Sgt. C.E. were intentional, not the result of any mistake or accident. Defendants wanted to knock down the barricade to get by USCP officers so that they could enter the cordoned-off Capitol grounds. They intentionally picked up a bicycle rack that formed a portion of a barricade and purposefully used it to strike and hit Sgt. C.E. because she was blocking their path.

The Court draws these conclusions from the evidence presented at trial—both Sgt. C.E.'s testimony and the video evidence. The Court finds that both Defendants had to have seen Sgt. C.E. as they were lifting and pushing the bicycle rack. Mr. Randolph was standing in front of Sgt. C.E and was the first of these Defendants to try and knock down the barricade by pushing it. Gov. Ex. 302 at 0:50–0:55; Gov. Ex. 308 at 0:35–0:40. As he pushed on the bicycle rack, he stood only a few feet away from Sgt. C.E. and was looking toward her. Gov. Ex. 302 at 0:50–0:55. He must have seen that he was moving her backward as he pushed. *Id.* Indeed, it looks to the Court from

the video evidence that Mr. Randolph pushed the rack into Sgt. C.E. so that he could move her out

of his way. *Id.* His actions after the barricade toppled further convince the Court that Mr. Randolph

wanted to get beyond the barricade and Sgt. C.E. After he successfully knocked the barricade and

Sgt. C.E. down, he leapt over it, grabbed another officer, Gov. Ex. 302 at 1:00–1:09, and remained

on the Capitol grounds for hours, Randolph Ex. 2 at 0:15–0:20 (showing Mr. Randolph on the

Upper West Terrace at 3:27 P.M.).

The Court draws similar conclusions regarding Mr. Samsel from the trial evidence. He

joined Mr. Randolph in pushing and lifting the bicycle rack that was in front of Sgt. C.E. The Court

concludes that he had to have seen Sgt. C.E. standing in front of the rack—he was close to her and

looking in her direction. Gov. Ex. 308A at 0:20. The video evidence also shows him pushing the

bicycle rack into Sgt. C.E. Gov. Ex. 302 at 0:55–0:57; Gov. Ex. 308 at 0:38–0:45. At trial, Mr.

Samsel argued that after Sgt. C.E. hit the ground, he helped her up and returned her hat to her.

Gov. Ex. 309 at 1:30–1:35; ECF 317 at 48:24-49:8. The Court agrees that he did. Presumably, he

emphasized this conduct to make the point that he did not intend to assault Sgt. C.E., but the Court

does not see it that way. It is certainly possible that Mr. Samsel did not intend for Sgt. C.E. to be

hurt as badly as she was. But the intent element does not require the Court to find that a defendant

intended a specific injury, rather the Court must find that the defendant intended to commit one of

the statute's prohibited acts (and intended to use an object or weapon where applicable). *See, e.g.*,

*Arrington*, 309 F.3d at 46. Mr. Samsel did not pick up the bicycle rack by accident nor did he push

it into Sgt. C.E. by mistake. His conduct was repeated. Gov. Ex. 308 at 0:39–0:47. He intended to

use the bicycle rack to resist, oppose, impede, and interfere with Sgt. C.E.'s efforts to hold the

barricade in place and keep him out of the closed area, and to shove her out of his way. Like Mr.

Randolph, after the barrier and officers were out of his way, Mr. Samsel pressed further onto

Capitol grounds, where he remained for over an hour. Gov. Ex. 204 at 14:00–15:00 (showing barricade breached at 12:54 pm); ECF 318 at 158:3–7 (Agent Maldonado testifying that Mr. Samsel did not leave the grounds until sometime between 2:00 and 2:30 P.M.).

### 4. Sgt. C.E. is a Designated Federal Officer Engaged in the Performance of Official Duties

Section 111(a) covers any person designated in 18 U.S.C. § 1114 and thus applies to "any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services)," as well as "any person assisting such an officer or employee." 18 U.S.C. § 1114(a). Sgt. C.E. fits this definition as a member of the USCP. And the Court has already explained that she was on-duty and engaged in the performance of her official duties at the time of Defendants' conduct. *See infra* Section II(A)(ii).

### ii. *The Enhanced Penalty Applies to Mr. Samsel and Mr. Randolph*

Finally, for § 111(b)'s enhanced penalty to apply, the Court must additionally find that Defendants used "a deadly or dangerous weapon" against or "inflict[ed] bodily injury" on Sgt. C.E. The Court rules that the Government has proven this element beyond a reasonable doubt.

There was much argument at trial about whether a bicycle rack is a deadly or dangerous weapon. A bicycle rack is not an inherently dangerous weapon, but almost any object can qualify as such if it is "capable of causing serious bodily injury or death" and is "used…in that manner." *See Arrington*, 309 F.3d at 45. Mr. Samsel and Mr. Randolph used these bicycle racks in a manner that made them capable of causing serious injury to Sgt. C.E. Defendants lifted a heavy, large, metal rack in the air and used it to push and strike Sgt. C.E. to move her out of their way. *See infra* Section I(B)(ii). The Court has no question that a person could be seriously injured if hit in the head or face with 50 pounds of metal—particularly from overhead. Mr. Samsel and Mr. Randolph pushed the bicycle rack with enough force to knock her down. *See infra* Section I(B)(ii). And there

was a real risk that Sgt. C.E. could have been pinned to the ground when Defendants pushed her back and toward the stairs, with the metal barricade on top of her. *See, e.g.*, ECF 317 at 15:19–16:8, 42:15–21, 120:13–121:7.

In fact, Sgt. C.E. was injured as a result of Defendants hitting her with the metal bicycle rack. Accordingly, the § 111(b) enhancement also applies because Mr. Samsel and Mr. Randolph inflicted a bodily injury on Sgt. C.E. The Court has already concluded that Mr. Samsel and Mr. Randolph struck Sgt. C.E. in the face with a bicycle rack and knocked her down, which caused her to whack her head on the metal railing and the ground. Gov. Ex. 308A at 0:25–0:40; ECF 317 at 42:6–43:17. Video evidence shows that she hit her head hard. Gov. Ex. 308A at 0:35–0:40; ECF 317 at 45:7–10. Sgt. C.E. testified about the significant pain and injuries she suffered because Defendants assaulted her with the barricade. When Defendants knocked her down and she hit her head on the railing, she lost consciousness, which the Court observes on the video. *See Gov.* Ex. 308A at 0:35–0:40, Gov. Ex. 302 at 1:03; *see also* ECF 317 at 42:6–14; 44:3–8. Sgt. C.E. also described swelling on her face. ECF 317 at 53:16–54:1. She was groggy, dizzy, and incoherent in in her communications with a coworker later that day. *Id.* at 55:22–56:4. At her police station that evening, her vision was blurry and she passed out a second time. *Id.* at 56:23–57:13. She was then transported to the hospital by ambulance for medical attention. *Id.* at 58:14–20. At trial, she described the level of pain she experienced in the hospital as "excruciating" and testified that she had to clamp her mouth shut to prevent herself from vomiting or screaming. *Id.* at 59:8–16. She described her entire day after her encounter with Defendants and nothing else happened to her that could explain the swelling, pain, and loss of consciousness that she experienced, other than Defendants hitting her in the face with a bicycle rack and knocking her to the ground. According to Sgt. C.E., the intense pain persisted for weeks, at least, and she received medical attention,

22

including physical therapy, following her assault at the Capitol. *Id.* at 61:20–25. The Court fully credits Sgt. C.E.'s testimony about the nature and extent of the injuries she suffered.[9] Unconsciousness, swelling, and severe pain that requires medical intervention to treat amply satisfy §111(b)'s bodily injury prong.

Because the Government has proven all elements of 18 U.S.C. § 111(b) beyond a reasonable doubt, the Court finds Mr. Samsel and Mr. Randolph GUILTY of count two. Given the Court's findings it is unnecessary for the Court to also consider the Government's alternative argument that these Defendants aided and abetted others in committing this offense.

### iii.     *Mr. Grant, Mr. Johnson, and Mr. Blythe are Not Guilty of Count Two*

The Court must acquit Mr. Grant, Mr. Johnson, and Mr. Blythe of count two because it is not convinced beyond a reasonable doubt that these Defendants assaulted, resisted, or impeded Sgt. C.E. or that it was their intent to so. To be clear, each of these Defendants engaged in criminal conduct against a USCP officer at the Capitol, *see supra* Section II(C), but the Court cannot make the required findings as to Sgt. C.E. Again, these events are captured on video. Unlike Mr. Samsel and Mr. Randolph; Mr. Grant, Mr. Johnson, and Mr. Blythe do not appear to have had any direct interaction with Sgt. C.E.

A brief description of the scene and these Defendants' relative positions at the second barricade informs the Court's findings. As the Court has already found, the barricade at the bottom of the stairs on the Pennsylvania Walkway consisted of metal bicycle racks, linked together,

---

[9] Sgt. C.E. provided additional testimony regarding her extensive injuries at trial. For example, she testified about various medications she was prescribed after January 6th, ECF 317 at 62:18-23, 63:17–25; migraines that she continues to have, *id.* at 64:5–6; as well as that she was placed on desk duty for well over a year, *id.* at 64:10–13. At trial, Mr. Samsel made arguments raising questions about causation for these injuries, particularly given that the Government did not call a medical expert. While the Court, again, fully credits Sgt. C.E.'s testimony, it is not necessary for the Court to make causation findings as to Sgt. C.E.'s subsequent migraines, blackouts, or chronic concussive symptoms. That is because the injuries and pain she suffered on January 6th recounted in the text, and which the Court concluded were directly caused by Defendants, establish beyond a reasonable doubt that Defendants inflicted bodily injury upon her.

reinforced with zip ties, and covered with snow fencing. *See, e.g.*, ECF 317 at 35:20–25. At the time of the events relevant to count two, Mr. Grant was positioned in front of a rack that adjoined the one that Mr. Samsel and Mr. Randolph were pushing. Gov. Ex. 332 at 0:30–0:37; Gov. Ex. 309 at 1:25–2:28. Mr. Johnson stood next to Mr. Grant around the "joint" linking these two bicycle racks. Gov. Ex. 332 at 0:32–0:37. Mr. Blythe stood between Mr. Grant and Mr. Johnson and pushed directly on the joint. *Id.* To be sure, these Defendants were attempting to knock the barricade down and push portions of it toward another USCP officer (Officer D.C.) to move him out of their way. *See supra* Section II(C). But the Court is not convinced that any of these Defendants had any interactions with, impact on, or even awareness of Sgt. C.E.[10] Although the Government and the Defendants disagreed over how the connected bicycle racks operated in relation to each other, there is evidence from which the Court concludes that the joined racks moved independently of one another when pushed in different directions. *See, e.g.,* ECF 315 at 36:14–37:6. Evidence at trial established that the bicycle racks pivot or fold at the joints when pushed and do not necessarily remain parallel. *Id.* at 45:1–11; ECF 317 at 42:6–9; *see* Gov. Ex. 302 at 0:55. Given these Defendants' positions and how (and where) they were pushing on the bicycle racks, the Court can tell that these Defendants hit Officer D.C. *See supra* II(C). But the Court cannot be certain that Mr. Grant, Mr. Johnson, and Mr. Blythe contributed to Sgt. C.E. being struck. Notably, Mr. Samsel and Mr. Randolph were the only Defendants that Sgt. C.E. identified or described when she explained the relevant video footage and what happened to her. ECF 317 at 39:16–21, 40:7–11. (Sgt. C.E. testifying that the "man with the gray hat" and the "man with the red hat" were pushing on the bicycle racks in front of her.).

---

[10] For these same reasons, the Court cannot find that Mr. Grant, Mr. Johnson, or Mr. Blythe aided and abetted Mr. Randolph and Mr. Samsel in their assault of Sgt. C.E.

At a broad level of generality, every person in the crowd made Sgt. C.E.'s job harder. Each of these Defendants tried to break down the barricade, assaulted and impeded law enforcement, and faces conviction for their conduct. But not for multiple counts of the same offense for the same conduct. Because the Court is mindful of the Government's high burden of proof to establish each element of the offense beyond a reasonable doubt as to each Defendant, the Court finds Mr. Grant, Mr. Johnson, and Mr. Blythe NOT GUILTY of count two.

### C.  COUNT THREE

Count three charges each Defendant with assaulting, resisting, or impeding Officer D.C. using a dangerous weapon, or aiding and abetting others in committing that offense, in violation of 18 U.S.C. §§ 111(a)(1), (b), 2. Like count two, this charge arises out of Defendants' conduct on the Pennsylvania Walkway, but against another USCP officer in the police line. The Court finds that Mr. Grant, Mr. Johnson, and Mr. Blythe are GUILTY of assaulting, resisting, or impeding Officer D.C. with a deadly or dangerous weapon. For reasons similar to the Court's findings on count two, the Court finds Mr. Samsel and Mr. Randolph NOT GUILTY of this charge.

#### i.   *Mr. Grant, Mr. Johnson, and Mr. Blythe are Guilty of Count Three*

The Court has already identified the elements for this offense, *see infra* Section II(B), and considers them in turn below.

##### *1.  Defendants Assaulted, Resisted, or Impeded Officer D.C.*

Mr. Grant, Mr. Johnson, and Mr. Blythe assaulted, resisted, opposed, impeded, and interfered with Officer D.C. The Court has already described where these Defendants were standing at the second barricade. *See infra* Sections I(B)(iii), II(B)(iii). They were clustered close

to Officer D.C. Gov. Ex. 309 at 1:26–1:27.[11] Each of these Defendants put their hands on the bicycle racks, lifted them off the ground, and pushed them toward Officer D.C. Gov. Ex. 332 at 0:32–0:34. As a result, the bicycle racks hit him and drove him backward. *Id.* at 0:32–0:37. It should go without saying that shoving someone is an assault. And, at minimum, Mr. Grant, Mr. Johnson, and Mr. Blythe resisted, opposed, impeded, and interfered with Officer D.C. when they pushed the barricade into him. Officer D.C. was trying to restore order and reinforce the police line to prevent the crowd from crossing the barricade, which he could not do because of Defendants' conduct. ECF 317 at 113:9–19; *see also* Gov. Ex. 332 at 0:35–0:40.

### 2. Defendants Committed the Prohibited Conduct Forcibly

Having already recognized that this offense requires that a defendant commit the statute's prohibited acts forcibly, *see infra* Section II(B)(i)(2), the Court need not belabor the point. The Court finds that Defendants' conduct in pushing Officer D.C. with the metal barricade, making physical contact with him, and driving him backward satisfies this element of the offense.

### 3. Defendants Committed Their Conduct Voluntarily and Intentionally

Defendants' conduct was intentional. Mr. Grant, Mr. Johnson, and Mr. Blythe were each in front of Officer D.C. and undoubtedly saw him. *See* Gov. Ex. 332 at 0:30–0:37; Gov. Ex. 309 at 1:25–1:28. Nonetheless, each grabbed onto the barricade, shoved it into him, and continued to push him back until the barricade fell. Gov. Ex. 332 at 0:31–0:40. From the video evidence and Officer D.C.'s testimony that the Court has already cited, the Court concludes beyond a reasonable doubt that Defendants intended to push Officer D.C.

---

[11] The Court recognizes that Mr. Johnson had his hands on the same metal rack that Mr. Randolph and Mr. Samsel were pushing, and that Mr. Blythe had one hand on that bicycle rack as well. However, both Mr. Johnson and Mr. Blythe are on the opposite end of the bicycle rack from Sgt. C.E., directly in front of Officer D.C., and pushing the barricade toward Officer D.C. Gov. Ex. 332 at 0:32–0:36.

Their later actions shed additional light on their intent. After pushing Officer D.C., each of these Defendants entered further into restricted areas of the Capitol grounds. Mr. Johnson went to the Lower West Terrace and tried to rally the crowd, calling for them to "push this shit down," Gov. Ex. 334 at 0:50–0:59, and claiming that the vote had been stolen, *id.* at 0:00–0:34. Mr. Grant made his way inside the Capitol building at 2:49 P.M., almost two hours after the breach of Peace Circle, and stayed there until 3:18 P.M. ECF 318 at 32:9–16. And Mr. Blythe went to the Upper West Terrace, where officers had to forcibly remove him from a wall at 4:38 P.M. Gov. Ex. 403 at 2:20–3:28; ECF 322 at 90:17–91:6. Their subsequent conduct makes clear to the Court that their aim was to knock down the barricade and move Officer D.C. out of their way so that they could get into the closed areas of the Capitol grounds.

#### 4. Officer D.C. is a Designated Federal Officer Engaged in the Performance of Official Duties

Like Sgt. C.E., Officer D.C. was a USCP officer who was performing his official duties as part of the Civil Disturbance Unit on January 6th. ECF 317 at 101:6–24.

### ii. The Enhanced Penalty Applies to Mr. Grant, Mr. Johnson, and Mr. Blythe

The Court has already detailed what is required to find that the § 111(b) enhancement applies. *See infra* Section II(B)(ii). The Court finds beyond a reasonable doubt that Defendants used the bicycle racks as a deadly or dangerous weapon. Mr. Grant, Mr. Johnson, and Mr. Blythe used the barricade against Officer D.C. in the same manner that Mr. Samsel and Mr. Randolph used it against Sgt. C.E. *See infra* Section II(B)(ii). Together, they lifted a large, metal object off the ground—over Officer D.C.'s head—and shoved it into Officer D.C.'s upper body to move him out of their way. *See* Gov. Ex. 332 at 0:32–0:37. As the Court found earlier, ramming a heavy metal object into someone's upper body can seriously injure them. *See infra* Section II(B)(ii). The video makes clear that Defendants used enough force to drive Officer D.C. back and overwhelm

him. *See* Gov. Ex. 332 at 0:32–0:37. Officer D.C. described what happened to him and testified about the real fear that he would be trampled and pinned down by the bicycle racks because of the way that Defendants were using them. ECF 317 at 120:13–121:7; *id.* at 122:19–24. The Court credits his testimony.

Accordingly, the Court finds Mr. Grant, Mr. Johnson, and Mr. Blythe GUILTY of assaulting, resisting, or impeding Officer D.C. with a deadly or dangerous weapon, in violation of 18 U.S.C. §§ 111(a), (b). Given the Court's findings that Mr. Grant, Mr. Johnson, and Mr. Blythe are principals, it is not necessary for the Court to also consider whether they aided and abetted others in committing this offense.

### iii.   *Mr. Samsel and Mr. Randolph are Not Guilty of Count Three*

For the same reason that the Court acquitted Mr. Grant, Mr. Johnson, and Mr. Blythe of count two, it finds Mr. Samsel and Mr. Randolph NOT GUILTY of count three. The Court has already recounted the facts concerning Mr. Samsel's and Mr. Randolph's positions and actions related to pushing the barricade, and the way the bicycle racks buckled and folded in at their joints. *See infra* Section II(B)(iii). The Court cannot find beyond a reasonable that their conduct impacted Officer D.C.[12]

### D.   COUNT FOUR

As the Court has already found, moments after the barricade fell, Mr. Randolph jumped over it, turned sharply toward Officer D.C., and grabbed him with both hands. Gov. Ex. 302 at 1:04–1:09. From there, he scuffled with Officer D.C. *Id.* Mr. Randolph remained latched onto Officer D.C., even as Sgt. T.L. attempted to remove him, and only released Officer D.C. once a third officer intervened. Gov. Ex. 332 at 0:50–0:54; Gov. Ex. 302 at 1:12–1:17. For this conduct,

---

[12] Similarly, the Court cannot find that these Defendants aided and abetted Mr. Grant, Mr. Johnson, and Mr. Blythe in their assault of Officer D.C.

Mr. Randolph is charged with another count of assaulting, resisting, or impeding Officer D.C., in violation of 18 U.S.C. § 111(a)(1). The Court has already set forth the elements of this offense and will not repeat them. *See infra* Section II(B). The Court finds that the Government has satisfied its burden of proving those elements beyond a reasonable doubt. Accordingly, the Court finds Mr. Randolph GUILTY of this offense.

### i.   *Mr. Randolph Committed His Conduct Voluntarily and Intentionally*

Mr. Randolph's defense to this count concerned his intent. He argued that the Government could not prove that he intended to assault, impede, or resist Officer D.C. According to Mr. Randolph, the video evidence is consistent with him having tripped and reflexively grabbed Officer D.C. to prevent himself from falling. To be sure, the Court observes from the video that in trying to jump over the barricade Mr. Randolph caught his foot on it and stumbled. Gov. Ex. 308 at 0:47–0:50. But then he turned toward Officer D.C. and grabbed him. *Id.* Officer D.C. testified that "[h]e just came right at me." Ex. 317 at 128:2–4. Officer D.C. also recounted that he tried to pull away from Mr. Randolph's grasp. *Id.* at 129:21–24; *see also* Gov. Ex. 308 at 0:56. But, according to Officer D.C., Mr. Randolph continued to struggle with him and would not let him go. ECF 317 at 130:13–16. Sgt. T.L. tried to pull Mr. Randolph off Officer D.C., ECF 315 at 118:7–12, but Mr. Randolph continued holding onto him, Gov. Ex. 332 at 0:50–0:54; Gov. Ex. 302 at 1:12–1:17.

The Court credits Officer D.C.'s and Sgt. T.L.'s testimony regarding these events, which is consistent with the Court's understanding of what happened from the video evidence. Based on this evidence, the Court has no question that Mr. Randolph intentionally grabbed and tussled with Officer D.C. The fact that Sgt. T.L. had to help pry Officer D.C. out of Mr. Randolph's grasp is inconsistent with any suggestion that Mr. Randolph only grabbed Officer D.C. to steady himself

after tripping. Further, the Court considers this conduct in the context of Mr. Randolph's actions (described above) that clearly demonstrate his intent to resist and impede officers in the police line so that he could get into the restricted areas of the Capitol grounds. He assaulted an officer (Sgt. C.E.), jumped over the barricade, and then grabbed Officer D.C. to remove him from the police line.

ii.   ***The Court Finds the Remaining Elements Beyond a Reasonable Doubt as to Mr. Randolph***

Having found the relevant facts and resolved the question of Mr. Randolph's intent, the Court concludes that the remaining elements of § 111(a)(1) (felony) were proved beyond a reasonable doubt at trial. The Court's findings above make clear that Mr. Randolph assaulted, resisted, opposed, impeded, and interfered with Officer D.C. by initiating a scuffle with him. Grabbing Officer D.C. to the point where other officers had to intervene to separate him readily satisfies the statute's "forcible" component. The Court has already found that Officer D.C. is a designated officer who was engaged in the performance of his official duties at the time of this offense. *See infra* Section II(C)(i)(4). And Mr. Randolph is guilty of a felony because he made physical contact with Officer D.C. 18 U.S.C. § 111(a).

### E.  COUNTS FIVE THROUGH SEVEN

Counts five through seven charge each Defendant with violating various subsections of 18 U.S.C. § 1752(a). Count five charges all Defendants with entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1). Count six charges Defendants with disorderly or disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2). Finally, count seven charges each Defendant with engaging in physical violence in a restricted building or grounds. 18 U.S.C. § 1752(a)(4). For each of these counts, Defendants are alleged to have violated the statute while using or carrying a deadly or dangerous weapon. Count

seven alleges that Defendants' conduct resulted in significant bodily injury. *See* 18 U.S.C. §§ 1752(a)(4), (b)(1)(B). Defendants are also charged with aiding and abetting others in committing these offenses. The Court finds Mr. Samsel, Mr. Grant, Mr. Johnson, Mr. Randolph, and Mr. Blythe NOT GUILTY of counts five through seven.

Before explaining the reasons for its verdict, the Court will address the Parties' disagreement over the elements of these offenses, a subject of which the Court has entertained much argument and briefing. The Court has changed its position on the matter and explains why below.

As background, the Parties dispute what degree of "knowledge" a defendant must possess to run afoul of 18 U.S.C. § 1752(a). Section 1752(a)(1) (count five), for example, requires that a defendant "knowingly enter[] or remain[] in a[] restricted building or grounds without lawful authority to do so." Section 1752(c)(1) then provides a definition of "restricted building or grounds," which "means any posted, cordoned off, or otherwise restricted area" of (A) the White House or the Vice President's residence, (B) a building or grounds where the President or another Secret Service protectee is or will be visiting, or (C) a building or grounds restricted for a special event of national significance. The statutory provisions that are the subject of counts six and seven similarly charge Defendants with knowingly committing prohibited conduct in a restricted building or grounds. *See* 18 U.S.C. § 1752(a)(2) (count six, which prohibits "knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engag[ing] in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions"); 18 U.S.C. § 1752(a)(4) (count seven, which

prohibits "knowingly engag[ing] in any act of physical violence against any person or property in any restricted building or grounds.").

The Government argues that the term "knowingly" reaches only the first portion of the definition of "restricted building or grounds." That is, using count five as an example, a defendant is guilty of § 1752(a)(1) if the defendant knows that an area is "posted, cordoned off, or otherwise restricted," without more. ECF 328 at 11. Defendants counter that culpable knowledge must extend to the entire statutory definition, not just part of it, meaning a defendant must know that an area is "posted, cordoned off, or otherwise restricted" *and*, in this case, that it is a "building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." ECF 311 at 3–7. The Parties take the same, respective positions for the subsections at issue in counts six and seven.

While this Court adopted the Government's interpretation of § 1752(a) initially, *see* ECF 313, the Court now, with the benefit of supplemental briefing and well-reasoned opinions from other courts in this District, is convinced of Defendants' position. Critically, the Parties agree that a defendant must know that he is "entering or remaining, " "engag[ing] in disorderly or disruptive conduct," or "engag[ing] in any act of physical violence" *and* know that he is doing so in a "restricted building or grounds." *See* 18 U.S.C. §§ 1752(a)(1), (a)(2), (a)(4). The Parties also agree that the Government cannot secure a conviction without proving that the area was, as part of the requisite *actus reus*, in fact a "restricted building or grounds"—not just a place that was "posted [or] cordoned off," but one that meets the full statutory definition laid out a mere two paragraphs down from § 1752(a). Thus, as explained by Judge Nichols and reiterated by Judge Cooper, and contrary to the Government's argument here, *see* ECF 328 at 8, Defendants' construction merely "applies ['knowingly'] to the phrase 'restricted building or grounds'. . . which, because of the

statutory definition, means what the statutory definition says." *United States v. Groseclose*, No. 21-CR-311 (CRC), 2024 WL 68248, at *3 (D.D.C. Jan. 5, 2024) (quoting *United States v. Elizalde*, No. 23-CR-170 (CJN), 2023 WL 8354932, at *3 (D.D.C. Dec. 1, 2023)). While the Court appreciates that legislative history and other contextual indicators may slightly push in the other direction, this Court, for the reasons laid out by Judge Cooper in *Groseclose*, "does not locate any background principle or purpose that overrides the statute's plain text applying the knowledge requirement to 'restricted building or grounds'—a statutorily defined term that requires more than an area being restricted in a colloquial sense of the word." *Id.* at *8; *see also Elizalde*, 2023 WL 8354932, at *5.

To be sure, the Court anticipates that additional questions may arise surrounding this statute, and the D.C. Circuit itself may well offer guidance soon. *See United States v. Griffin*, No. 22-3042 (oral argument held December 4, 2023). At present, however, the Court chooses to follow the informed trend of other courts in this District in concluding that, in order to violate § 1752(a), a defendant must know that an area is "posted, cordoned off, or otherwise restricted" *and* that at least one of three, statutorily-defined factual circumstances exists—in this case, that the area is "a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." 18 U.S.C. § 1752(c)(1)(B).

The Government proved that the grounds that Defendants entered were "restricted" as defined in the statute. The Vice President, his family, and his Secret Service detail were at the Capitol at the time of these events. Gov. Ex. 1201 at 216–17. But there is no evidence in the record from which the Court can conclude beyond a reasonable doubt that Defendants knew of the presence of protected people. Accordingly, the Court finds Mr. Samsel, Mr. Grant, Mr. Johnson, Mr. Randolph, and Mr. Blythe NOT GUILTY of counts five through seven.

### F.  COUNT EIGHT

Count eight charges each Defendant with engaging in disorderly and disruptive conduct within the Capitol grounds or in any of the Capitol buildings. To convict a defendant of this charge, the Government must prove the following elements beyond a reasonable doubt: First, the Government must prove that the Defendant engaged in disorderly or disruptive conduct in the Capitol building or grounds. 40 U.S.C. § 5104(e)(2)(D). Second, the Government must prove the defendant acted with the intent to impede, disrupt, or disturb the orderly session of Congress or either House of Congress—here, the certification proceeding. *Id.*; *see also* ECF 313 at 28–29. Finally, the Government must prove the defendant acted willfully and knowingly. 40 U.S.C. § 5104(e)(2)(D). The Court finds that these elements are satisfied beyond a reasonable doubt for Mr. Samsel, Mr. Grant, and Mr. Johnson, and that they are GUILTY of this offense. However, the Court finds that Mr. Randolph and Mr. Blythe are NOT GUILTY of this offense.

### i.  *Mr. Samsel, Mr. Grant, and Mr. Johnson are Guilty of Count Eight*

#### 1.  *Defendants Engaged in Disorderly or Disruptive Conduct at the Capitol*

In its legal instructions, the Court defined disorderly or disruptive conduct to include "conduct that tends to disturb the public peace or undermine public safety" or creates a "disturbance that interrupts an event, activity, or the normal course of a process." ECF 313 at 24–25. (citing *Black's Law Dictionary* (9th ed. 2009) and Redbook 6.643). The evidence is overwhelming that Mr. Samsel, Mr. Grant, and Mr. Johnson engaged in disorderly and disruptive conduct on January 6th. The Court has already recounted much of it. Their disorderly conduct includes knocking down barricades, assaulting officers, and refusing to the leave the grounds as ordered. *See infra* Section I(B)–(C). Mr. Samsel, Mr. Grant, and Mr. Johnson went on to commit other acts that the Court concludes disturbed the peace, undermined public safety, and disturbed

the normal course of a process. As the Court will address more later, Mr. Samsel initiated more skirmishes with law enforcement, including trying to wrestle a riot shield from one officer and hurling a 2x4 at others. *See supra* Sections II(J), (K). Mr. Johnson used a megaphone to encourage others nearby to "push this shit down," Gov. Ex. 320 at 0:01–0:38; Gov. Ex. 334 at 0:50–1:02, and taunted USCP officers, Gov. Ex. 302 at 0:16–0:25. Mr. Grant climbed into the Capitol Building through a broken window. Gov. Ex. 206 at 0:49–0:55. Inside, he entered and took pictures of himself in sensitive areas, including a congressional office. Gov. Ex. 1102C; Gov. Ex. 1102D. And the Court has already found that each Defendant engaged in this conduct on the Capitol grounds, including on the Pennsylvania Walkway, in and around the West Front, and, in Mr. Grant's case, in the Capitol building itself. *See infra* I(B)–(C); *see also* ECF 313 at 28 (defining boundaries of Capitol grounds).

### 2. *Defendants Intended to Impede, Disrupt, or Disturb a Session of Congress*

The Court finds beyond a reasonable doubt that Mr. Samsel, Mr. Grant, and Mr. Johnson intended to impede, disrupt, or disturb a session of Congress, specifically the joint session to certify the electoral vote. Ample evidence leaves the Court with no question about Mr. Samsel's, Mr. Johnson's, and Mr. Grant's intent.

Starting with Mr. Samsel, the Court concludes beyond a reasonable doubt that he came to the Capitol on January 6th to disrupt Congress and, specifically, the certification of the 2020 election. His statements prove that he was acutely aware of what was happening regarding the election. For example, early on the morning of January 6th, he sent a text to a friend to tell him that the "[f]ucking demarcates [sic] won Georgia see you soon." Gov. Ex. 1103A; *see also* ECF 318 at 162:4–17. "See you soon," referred to seeing the friend in Washington, D.C later that day. ECF 318 at 175:2–14. The logical inference the Court draws from the text message is that Mr. Samsel intended to see his friend soon in Washington, D.C. because of the election results. Mr. Samsel

came to Washington, D.C. on the day that Congress convened to certify the election, at the location it was supposed to take place, and at the time that the certification was supposed to happen. The Court does not find that is a coincidence. While on Capitol grounds, he waved a "Rambo-style flag" depicting former President Trump's face on Rambo's body. *Id*. at 147:2-149:9 (Agent Curcio identifying Mr. Samsel in Government Exhibit 408). And at Peace Circle, Mr. Samsel was surrounded by people yelling "Stop the steal." Gov. Ex. 308 at 0:09–0:12. The Court does not hold him accountable for what others were saying and doing, but the video evidence makes clear that he was not oblivious to what was happening around him. To the contrary, the video evidence shows him fully immersed in his surroundings. Despite being aware that the crowd had gathered to "Stop the steal," he remained on the Capitol grounds and recorded himself smiling and saying, "We breached the Capitol!" Gov. Ex. 1103B. And then there is his conduct at the Capitol. He was not just present on the grounds, or picketing or demonstrating. He knocked down barricades so that he could get into closed areas of the grounds, assaulted and argued with officers, and otherwise engaged in significantly disruptive conduct. This all leaves the Court with the conclusion that he was trying to disrupt what was going on at the Capitol, which the Court is firmly convinced he understood to be some proceeding related to the certification of the election based on the trial evidence.

And if the Court had any question about Mr. Samsel's intent, his subsequent statements fill in the gaps. After leaving the Capitol, for example, he sent a text message to an acquaintance bragging about being the "first ones to brake [sic] down the door." Gov. Ex. 1103T. He also forwarded a news article bearing a headline that referred to "halting Congress's counting of electoral votes," took responsibility for what occurred, and again claimed to have been the "first one over the fence." *See* Gov. Ex. 1103V; Gov. Ex 1103W. He boasted that "everybody followed"

him and that they "went nuts lol." Gov. Ex. 1103W. Although he sent these texts after he left the Capitol, they provide further evidence confirming the reason that he was there. At no point afterward did he express surprise that his conduct disrupted the official process or disclaim intent. To the contrary, he took pride in the fact that he believed he led the charge, which further confirms what his intentions were that day.

The Court also finds that Mr. Johnson intended to disrupt the certification proceedings. He said as much. Before the first barricade fell, Mr. Johnson can be heard on his megaphone yelling to the crowd to "Get on the front lines," and to "1776 this fence right here." Gov. Ex. 304. He said, "Do you think George Washington would be standing behind this motherfucker?," Gov. Ex. 304, and complained about women being on the "front lines" at Peace Circle, Gov. Ex. 340 at 1:24–1:31. And what follows, as the Court has already discussed, includes Mr. Johnson trying to knock down barricades and push a USCP officer out of his way to get further into the Capitol grounds. His later statements at the Capitol make clear the reason that he was upset, made war references, pushed down a police barricade, and encouraged others to behave similarly. Video later captures Mr. Johnson on Capitol grounds telling the crowd "They certified the vote. You going to stand around and watch now?" and "They just stole it." Gov. Ex. 334 at 0:00–0:34. He told those in the crowd to raise their voices because "They're debating because they're scared now." Gov. Ex. 319 at 0:23–0:27. The Court concludes that he must have been referring to the members of Congress as the people who were "debating" and who were "scared" (because of the conduct of the mob). He encouraged the crowd to check their internet and social media and told them "We need to push this shit down." Gov. Ex. 320 at 0:01-0:38; Gov. Ex. 334 at 0:50–1:02. These statements make clear to the Court that he was aware that a proceeding relating to certification was happening at the Capitol, that he was upset about it, and that he wanted to interfere with it.

The Government also proved beyond a reasonable doubt Mr. Grant's intent, for many of the same reasons the Court has described for Mr. Samsel and Mr. Johnson. For example, like Mr. Samsel, Mr. Grant made pre-offense statements that establish his awareness of what was happening with the 2020 election and his displeasure with the certification process. In the days before January 6th, he sent emails to Georgia lawmakers urging them to "decertify" and complaining about fraud. Gov. Ex. 1102A; Gov. Ex. 1102B. Of course, there is nothing unlawful about him doing so. But when he then showed up at the Capitol on the day that Congress was slated to certify the election results, after urging another legislator to "decertify," the Court, again, cannot find that to be a coincidence. Put another way, evidence that Mr. Grant was upset about the certification of the election is highly relevant to the Court when he then showed up to the Capitol on the date and at the time of the certification proceeding and acted in the manner that the Court has already recounted. The totality of evidence presented proves that he knocked down barriers, pushed his way through a police line, and climbed into the Capitol building through a broken window to disrupt the proceeding he was so upset about.

### 3. Defendants Acted Willfully and Knowingly

The Court finds that the evidence establishes the final element of this offense beyond a reasonable doubt as to Mr. Samsel, Mr. Grant, and Mr. Johnson. For reasons the Court has already explained, Defendants' conduct was willful, knowing, purposeful, and not the result of any mistake or accident. *See infra* Sections II(B)(i)(3), (C)(i)(3). Accordingly, the Court finds that Mr. Samsel, Mr. Grant, and Mr. Johnson are GUILTY of count eight.

### ii.    *Mr. Randolph and Mr. Blythe are Not Guilty of Count Eight*

On the other hand, the Court cannot find Mr. Randolph and Mr. Blythe guilty of count eight because the Court cannot find beyond a reasonable doubt that Mr. Randolph or Mr. Blythe

intended to disrupt or impede a session or hearing of Congress. The trial record does not reveal much about these Defendants' intent or what they knew or believed was happening inside the Capitol when they were on Capitol grounds. While proof of intent does not require express statements from a defendant and may be ascertained from circumstantial evidence, such evidence is a bit thin here. The Court does not have any information about Mr. Randolph's or Mr. Blythe's conduct prior to coming to the District on January 6th that might shed light on their intent, where they were immediately before they came to the Capitol, or what they may have heard or saw on Capitol grounds that proves beyond a reasonable doubt that they understood what was taking place inside the Capitol. Accordingly, the Court finds that Mr. Randolph and Mr. Blythe are NOT GUILTY of count eight.

### G. COUNT NINE

Count nine charges each Defendant with engaging in an act of physical violence in the Capitol grounds or buildings, or aiding and abetting another to commit that crime, in violation of 40 U.S.C. §§ 5104(e)(2)(F), 2. The elements of this offense are that the defendant (1) engaged in an act of physical violence within a Capitol building or its grounds and (2) acted willfully and knowingly. § 5104(e)(2). The statute's definition of an "act of physical violence" includes an assault. § 5104(a)(1)(A). Having already found that each Defendant committed an assault on the Capitol grounds using a deadly or dangerous weapon, *see infra* Sections II(B)(ii), (C)(ii), and that their conduct was done willfully and knowingly, *see infra* Sections II(B)(i)(3), (C)(i)(3), (D)(i), the Court finds Mr. Samsel, Mr. Grant, Mr. Johnson, Mr. Randolph, and Mr. Blythe GUILTY of count nine. Having found each Defendant to be a principal of assaultive conduct, the Court need not also consider whether any Defendant aided and abetted others in committing this offense.

**H. COUNT TEN**

Count ten charges each Defendant with obstructing an official proceeding, or attempting to or aiding and abetting others, in violation of 18 U.S.C. §§ 1512(c)(2), 2. The Court previously articulated the elements for this offense in its legal instructions. ECF 313 at 31. First, the Government must prove beyond a reasonable doubt that each Defendant obstructed or impeded an official proceeding. Second, the Government must prove that each Defendant acted with the intent to obstruct or impede the official proceeding. The Government must also prove that each Defendant did so knowingly, with awareness that the natural and probable effect of their conduct would be to obstruct or impede the official proceeding. *Id*. Finally, the Government must prove that each Defendant acted corruptly. 18 U.S.C. § 1512(c). The Court finds that Mr. Samsel, Mr. Grant, and Mr. Johnson are each GUILTY of this offense. But Mr. Randolph and Mr. Blythe are NOT GUILTY of this offense.

    i.    *Mr. Samsel, Mr. Grant, and Mr. Johnson are Guilty of Count Ten*

        1.  *Defendants Obstructed or Impeded an Official Proceeding*

The D.C. Circuit has held "that congressional certification of the Electoral College count is an 'official proceeding'" for purposes of § 1512(c)(2). *United States v. Fischer*, 64 F.4th 329, 342 (D.C. Cir. 2023).[13] Thus, the Government can satisfy this element if it proves that Defendants obstructed or impeded Congress's joint session to certify the results of the 2020 election.

The Court finds that Mr. Samsel, Mr. Grant, and Mr. Johnson obstructed and impeded the joint session. The evidence establishes beyond a reasonable doubt that Congress convened the joint session that afternoon. Because the Vice President was in attendance, and because law enforcement expected a large demonstration, USCP instituted additional security measures to ensure that the

---

[13] The Court is aware that the Supreme Court granted certiorari in *Fischer*.

Capitol grounds would be clear. ECF 314 at 9:8–10:8. But Mr. Samsel, Mr. Grant, and Mr. Johnson, along with others, breached the barricades that had been established and entered closed areas of the grounds (and, in Mr. Grant's case, the building). The session had to be suspended, the Vice President was evacuated, and members of Congress were forced to shelter in place because of the mob of rioters in and around the Capitol. *See* Gov. Ex. 1201 at 224:8–225:6; ECF 314 at 33:3–12. The session could not resume until much later that evening, after the Capitol and the grounds were cleared and secured. *See infra* Section I(C). The Court has already recounted Defendants' conduct at the Capitol, including their whereabouts after breaching the barricade and entering restricted grounds. *See infra* Sections I(B)–(C). Mr. Samsel, Mr. Grant, and Mr. Johnson were undoubtedly part of the mob on the grounds that prevented the session from resuming, and Mr. Grant also went inside the Capitol building.

### 2. Defendants Obstructed the Official Proceeding Knowingly and Intentionally

In count eight, the Court concluded that Mr. Samsel, Mr. Grant, and Mr. Johnson knew that a proceeding relating to the certification was happening in the Capitol and engaged in disruptive and disorderly conduct for the express purpose of interfering with that process. *See infra* Section II(F)(i)(2). The Court incorporates by reference those findings and conclusions here because they form the basis for the Court's determination that the Government established this element of the offense beyond a reasonable doubt as to Mr. Samsel, Mr. Grant, and Mr. Johnson. Having concluded that it was their purpose to obstruct and interfere with the certification proceeding, the Court has no question regarding Mr. Samsel's, Mr. Grant's, and Mr. Johnson's intent.

3. *Defendants Acted Corruptly*

A majority in *Fischer* agreed that individuals who assaulted law enforcement officers in an effort to stop Congress from certifying the 2020 election results on January 6th corruptly obstructed or impeded an official proceeding in violation of the statute.[14] Having concluded that Mr. Samsel, Mr. Grant, and Mr. Johnson assaulted law enforcement officers for the purpose of interfering with the Congressional proceeding, *see infra* Section II(F)(i)(2), the Court finds that Mr. Samsel, Mr. Grant, and Mr. Johnson acted with the corrupt intent necessary to sustain a conviction for this offense. Knowingly assaulting law enforcement officers is independently unlawful conduct that Mr. Samsel, Mr. Grant, and Mr. Johnson would have understood is unlawful by its nature. Indeed, law enforcement officers were actively trying to prevent them from engaging in this conduct and ordering them not to do so. *See infra* Section I(B)(ii)–(iii); *see also* ECF 313 at 33 (this Court's legal instructions providing that to act "'corruptly' the defendant must use independently unlawful means or act with an unlawful purpose, or both. The defendant must also act with 'consciousness of wrongdoing.' 'Consciousness of wrongdoing' means with an understanding or awareness that what the person is doing is wrong or unlawful."). Accordingly, the Court finds Mr. Samsel, Mr. Grant, and Mr. Johnson GUILTY of count ten.

---

[14] Judge Pan considered various definitions of the term corruptly in her opinion, including (1) "wrongful, immoral, depraved, or evil conduct," acting "with a corrupt purpose, through independently corrupt means, or both," and (3) an act that is "done voluntarily and intentionally to bring about either an unlawful result or a lawful result by some unlawful method, with a hope or expectation of either financial gain or other benefit to oneself or a benefit of another person." *United States v. Fischer*, 64 F.4th 329, 340 (D.C. Cir. 2023), *cert. granted*, No. 23-5572, 2023 WL 8605748 (U.S. Dec. 13, 2023). She recognized that under any of those definitions, a "corrupt intent exists at least when an obstructive action is independently unlawful…" *Id.* Judge Walker endorsed the latter definition (acting "with an intent to procure an unlawful benefit either for himself or for some other person.)." *Id.* at 352 (Walker, J. concurring). They agreed that assaulting law enforcement officers in connection with efforts to impede or interfere with the certification proceeding may satisfy this element. *Id.* at 342; *see also id.* at 361–2 (A defendant may have acted corruptly if they "used illegal means (like assaulting police officers) with the intent to procure a benefit (the presidency) for another person (Donald Trump)." (Walker, J. concurring).

ii.    *Mr. Randolph and Mr. Blythe are Not Guilty of Count Ten*

For the same reasons that the Court acquitted Mr. Randolph and Mr. Blythe of count eight, it must acquit these Defendants of count ten. *See infra* Section II(F)(ii). The Court cannot ascertain enough evidence in the trial record to conclude beyond a reasonable doubt that these Defendants were aware that any official proceeding was happening in the Capitol building while they were on the grounds or that they acted with the intent to impede any such proceeding. Accordingly, the Court finds Mr. Randolph and Mr. Blythe NOT GUILTY of count ten.

**I.  COUNT ELEVEN**

Count eleven is another charge of obstructing officers during a civil disorder, 18 U.S.C. § 231(a)(3), for Mr. Samsel. It arises from Mr. Samsel's conduct toward USCP officers guarding the West Plaza. The Court finds Mr. Samsel GUILTY of count eleven.

i.    *Mr. Samsel Knowingly Obstructed, Impeded, or Interfered with Law Enforcement Officers on the West Plaza*

The Court finds that Mr. Samsel repeatedly clashed with law enforcement officers on the West Plaza. As the Court earlier found, Mr. Samsel tried to wrestle a USCP officer's riot shield out of his hands as police in the area were trying to manage the riotous crowd. *See infra* Section I(C); Gov. Ex. 330 at 1:45–1:55, Gov. Ex. 321 at 0:00–0:14. By grabbing a USCP officer's protective gear and flagrantly disobeying their commands, Mr. Samsel obstructed, impeded, and interfered with the USCP officer's efforts to manage and disperse the crowd. The nature of Mr. Samsel's conduct makes clear that it was purposeful, intentional, and knowing. Indeed, he later bragged about what he had done, claiming to have started the riot, Gov. Ex. 1103R, Gov. Ex. 1103W, and admitting that he "went nuts," Gov. Ex. 1103W.[15]

---

[15] The Court finds that this conduct is sufficient to convict Mr. Samsel of this count, but the Court further recognizes that Mr. Samsel obstructed, impeded, and interfered with other units (like MPD) who had been deployed to assist

**ii.** ***USCP Officers Were Lawfully Engaged in the Lawful Performance of Their Duties During the Commission of a Civil Disorder***

The USCP officers that Mr. Samsel encountered at the Capitol were "officer[s]…of the United States," 18 U.S.C. § 232(7), "engaged in the lawful performance of [their] official duties," 18 U.S.C. § 231(a)(3), as they tried to control and disperse Mr. Samsel and other members of the crowd. The Court also finds that Mr. Samsel committed these acts on the West Plaza during a "civil disorder," which the Court defined earlier. *See infra* Section II(A)(ii). After the breach of Peace Circle, when Mr. Samsel was roaming the West Plaza, the crowd of people around the Capitol was large and violent. ECF 322 at 24:8–25. And while the Court will not recount all the trial testimony about violence at the Capitol on January 6th, suffice it to say there is overwhelming evidence that the mob caused a public disturbance that posed an immediate danger of injury to others, and indeed caused such injury.[16]

**iii.** ***Mr. Samsel's Conduct Impacted Commerce or a Federally Protected Function***

For the same reasons the Court found that the Government proved this element beyond a reasonable doubt for count one, the Court finds that the element has been proven here. *See infra* Section II(A)(iii). The Court incorporates by reference its findings and conclusions for count one. *Id.*

---

USCP. In one interaction, he yelled at officers and waved a flag in the officers' faces as the officers tried to maintain a police line to restore order at the Capitol. Gov. Ex. 408 at 0:05–0:55. As the Court earlier found, he simulated striking the officers multiple times with his flagpole, which interfered with their ability to carry out their duties. *Id.* at 0:57–1:05; Gov Ex. 307 at 1:03–1:12.

[16] In addition to the assaults at issue in this case, *see infra* Sections I(B)(ii), (iii), (C), there is other evidence establishing that the events of January 6th constituted a civil disorder. For example, Officer D.C. testified that he was assaulted close to 10 times that day. ECF 317 at 125:9–18. He also described the USCP and MPD's efforts to establish a new police line on the Lower West Terrace, testifying that, "it just ended up being more violence, more fighting. And we eventually lost the line." ECF 322 at 22:17–23:4. Video evidence admitted at trial shows that the large crowd was aggressive and engaged in physical confrontation with officers. *See, e.g.*, Gov. Ex. 330 at 1:45–1:55. Thus, there is no question in the Court's mind that Mr. Samsel committed the charged conduct incident to a civil disorder.

### J.  COUNT TWELVE

Count Twelve charges Mr. Samsel with another count of assaulting, resisting, or impeding a USCP officer, in violation of 18 U.S.C. § 111(a)(1). This count relates to the scuffle he got into with a USCP officer during which he tried to wrestle the officer's riot shield from him. The Court finds Mr. Samsel GUILTY of this (felony) offense.

The Court has already recounted the elements for this offense, *see infra* Section II(B), found facts concerning those elements that are relevant to the act charged, and described Mr. Samsel's conduct, *see infra* Sections I(C), II(I)(i). Thus, the Court will be brief so as not to be unduly repetitive. On the Southwest Plaza, Mr. Samsel got into a scuffle with another USCP officer and tried to pull the officer's protective gear (a riot shield) away from him. Gov. Ex. 314 at 2:55–3:10; *see also* ECF 318 at 140:11–142:23. Mr. Samsel was not successful in taking the shield, but managed to pull the shield down and expose the officer's face and torso to the crowd. Gov. Ex. 314 at 2:55–3:10. He used force in trying to take the officer's gear away from him, and the video evidence makes clear that his conduct was intentional. The Court thus has no question that his conduct served to assault, resist, impede, interfere, and oppose this officer, who the Court has already recognized was part of the group of officers trying to manage and disperse the crowd. Further, by the officer's uniform and gear, the Court identifies this officer as a member of USCP's Civil Disturbance Unit, and thus he is a designated federal officer who was engaged in the lawful performance of his lawful duties at the time he encountered Mr. Samsel. *See* ECF 315 at 146:24–147:2. Finally, the Court finds that Mr. Samsel's conduct involved physical contact with the officer and the intent to commit another felony. He grabbed the officer's shield, wrestled with him over it, and exposed the officer to the crowd. And the Court has already found that Mr. Samsel intended to commit other felony offenses, which also satisfies this element. *See infra* Sections II(H), (I).

Accordingly, Mr. Samsel is GUILTY of count twelve. The Court need not also consider whether he aided and abetted others in committing this offense.

### K.  COUNT THIRTEEN

Finally, Mr. Samsel is charged with another count of assaulting, resisting, or impeding officers with a deadly or dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1), (b). This count alleges that Mr. Samsel threw a wooden 2x4 at a line of MPD officers. The Court finds that the Government proved that Mr. Samsel committed this offense beyond a reasonable doubt and thus finds Mr. Samsel GUILTY of count thirteen.

Like much of Mr. Samsel's conduct, this incident is captured on video. As MPD Capt. Augustine testified at trial, MPD officers had established a police line on the West Plaza to hold back a crowd that was on the lawn. ECF 322 at 143:24–144:4. Mr. Samsel took a wooden, 2x4 plank that he found on the Capitol grounds and threw it at these officers. Gov. Ex. 203 at 6:53–7:09; Gov. Ex. 202. One officer ducked to avoid the plank. Gov. Ex. 203 at 7:08–7:09; Gov. Ex. 202 at 0:17–0:19.

The Court has identified the elements for this offense, *see infra* Section II(B), and finds that each has been satisfied beyond a reasonable doubt. First, Mr. Samsel assaulted, resisted, or impeded MPD officers. Throwing an object at a person is an assault. And his conduct also resisted, opposed, impeded, and interfered with officers who were trying to establish a police line to hold back the crowd. Next, the video makes clear that his conduct was forcible and intentional. Mr. Samsel threw the plank—hard—directly toward the line of police officers. He certainly did that on purpose. And the MPD officers on the scene of the Capitol count as designated officers under this statute because they were assisting USCP. *See* 18 U.S.C. § 1114(a); *see also* Section I(C). They were engaged in performing official police duties in trying to hold back the crowd of rioters.

That leaves the questions whether the Court finds that the wooden 2x4 Mr. Samsel threw at the police officers is a dangerous or deadly weapon and Mr. Samsel intended to use it as such. The answers to those questions are yes and yes. A 2x4, wooden plank, especially when hurled at someone's face and traveling as fast as it appears in the video here, can cause serious injury to a person. Intentionally throwing a wooden plank at a person is using it in that manner. The Court therefore finds that § 111(b)'s enhancement applies.

III.   **CONCLUSION**

For the foregoing reasons, the Court renders the verdicts as described in this order.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: February 9, 2024