**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-537 (JMC)** |
| **STEPHEN RANDOLPH,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Stephen Randolph to 135 months of incarceration, three years of supervised release, the mandatory assessment of $100 for each felony conviction and $10 for each class B misdemeanor conviction, and $2000 in restitution to the architect of the Capitol. This reflects the top of the guidelines range as calculated by the government.

## I.      INTRODUCTION

The defendant, Stephen Randolph, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States

1

Randolph participated in the first act of violence and the first breach of the restricted perimeter on January 6, 2021. After his co-defendant Ryan Samsel opened a section in the restricted perimeter fencing at the curb of the Peace Circle, Randolph made his way to the front of the crowd up against a second bike rack barrier guarded by Capitol Police officers. Randolph was one of the first rioters to begin forcibly pushing and pulling on this fencing before he and his co-defendants lifted the linked metal, bike rack barricades above the officers' faces and pushed the barricades into the line of police officers, striking Officer Caroline Edwards in the face with it and causing her to stumble backwards, strike her head on a metal handrail behind her, and fall on the steps beneath. Randolph then leapt over the barricade, grabbed Officer David Cruz, and held onto to Officer Cruz's clothing and arms for several seconds, pulling the officer toward the crowd. Sergeant Timothy Lively fought to separate Randolph from the officer, but Randolph grabbed Sergeant Lively's arm and pulled it down over Officer Cruz's head, thereby trapping Cruz in a headlock.

The importance of this initial breach cannot be overstated. The breach at the Peace Circle opened the floodgates for the siege of the United States Capitol, inundating its grounds and ultimately the Capitol building with thousands of rioters who poured onto the West Front of the

---

Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Capitol grounds through the opening Randolph made. Randolph stayed on Capitol grounds for hours, during which he climbed to the Upper West Terrace and watched the resulting violence at the Lower West Terrace tunnel – events he later characterized as "fun."

The government recommends that the Court sentence Randolph to 135 months' incarceration for his convictions for Count One, Obstructing, Impeding, or Interfering with Law Enforcement During a Civil Disorder, 18 U.S.C. § 231(a)(3); Count Two, Assaulting, Resisting or Impeding Certain Officers Using a Deadly or Dangerous Weapon and Inflicting Bodily Injury, 18 U.S.C. §§ 111(a)(1) and (b); Count Four, Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1), and Count Nine, Act of Physical Violence in a Capitol Building or Grounds, 40 U.S.C. § 5104(e)(2)(F).

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the Statement of Facts filed in Randolph's original docket (ECF 1, 1:21-mj-00382-RMM) for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.  Randolph's Actions Before The Peace Circle

In an interview after his arrest, Randolph told the FBI that he drove from Kentucky on January 5, 2021 and arrived in Washington D.C. on the morning of January 6. Randolph explained that he came to Washington D.C. because then-President Trump told everyone not to miss it and he had never been to a Trump rally before. He told the FBI "the whole reason [he] went" was to

3

hear Trump speak. Despite traveling all that way to see then-President Trump, Randolph did not even stay to see President Trump on stage. Instead, according to Randolph, after hearing Eric Trump speak, Randolph learned that people in the crowd planned to go to the Capitol building and he went with them. Randolph stated that he was "one of the first people" at the Capitol and described the barriers on the outer perimeter of the Capitol grounds and police presence.

### C.    Randolph's Conduct At The Peace Circle

The Capitol building and its surrounding grounds were closed to visitors on January 6, 2021 and a restricted perimeter had been established around its grounds in anticipation of the Vice President's visit and the certification of the 2020 election.[2] The restricted perimeter was made clear to the public through linked, metal bike rack barriers and snow fencing, much of which bore signs that read "Area Closed By Order of the United States Capitol Police Board" ("Area Closed signs"). Bike rack barriers were placed on the sidewalk next to the road at the Peace Circle, a traffic circle at the end of Pennsylvania Avenue on the northwest side of the Capitol grounds to mark the western boundary of the restricted area. The weight of each bike rack is approximately 25 to 50 pounds.

Additional barriers were established within the outer perimeter to further restrict access to the building. One such barrier was a barricade of bike racks, reinforced with snow fencing and zip ties, with several Area Closed signs attached, that barred the way up the Pennsylvania Avenue Walkway towards the Capitol building. The Pennsylvania Avenue Walkway is a footpath that runs

---

[2] The Court's Findings of Fact set out the facts elicited at trial in great detail and accurately reference the Government's exhibits. ECF 345 at 4-13. The intent of this memorandum is to highlight Grant's conduct, which underlies the guilty verdict for the counts identified above.

from the West Plaza of the Capitol building to the sidewalk at the road by the Peace Circle.



*Government Exhibit 12: Layout of the Peace Circle and the Pennsylvania Avenue Walkway barriers*

Between approximately 12:40 and 12:50 p.m., defendants Stephen Randolph, Ryan Samsel, James Grant, Paul Johnson, and Jason Blythe each individually joined a crowd on the Peace Circle roadway, just outside the outer perimeter barricades at the sidewalk. Randolph stated in the post-arrest interview that he "was one of the first people up there" and discussed the barriers and police presence intended to block his way up the Pennsylvania Avenue Walkway.

During that time, five U.S. Capitol Police ("USCP") officers, including Officers David Cruz and Caroline Edwards, were positioned at the top of a staircase and behind the second barricade on the Pennsylvania Avenue Walkway. USCP Sergeant Timothy Lively, who led their unit that day, was nearby on the West lawn.

While on the roadway, defendant Johnson used his megaphone to encourage and incite the crowd—including his codefendants—to descend on the Capitol building. Gov. Exs. 304 and 340. While pointing at the Capitol building Johnson yelled, "we can shout about Antifa all day long, but unless we get in there, it means nothing." Gov Ex. 340 at 00:55 - 1:01. Johnson yelled at the crowd to "Get on the front lines," and to "1776 this fence right here." Gov. Ex. 304. He rhetorically asked the crowd, "Do you think George Washington would be standing behind this motherfucker?" Gov. Ex. 304, and complained about women, instead of men, being on the "front lines" at the Peace Circle, Gov. Ex. 340 at 1:24–1:31.   In later statements, Randolph described Johnson's exhortations to the crowd as a major catalyst for the violence that followed. According to Randolph, a man with a megaphone incited the crowd. Randolph said that rioters rushed the fence in response to the man with the megaphone yelling, "Why are women on the front lines, we need our men up here." Gov. Ex. 523 at 18:55 – 19:25.

While Johnson yelled to "get on the front lines," Samsel made his way towards the bike racks at the curb of the Peace Circle. Gov. Exs. 304 and 340 at 1:25 – 2:00.   At approximately 12:53 p.m., Samsel tore open a section of the first metal bike rack barricade, which demarcated the restricted area, at the sidewalk curb next to the Peace Circle roadway. Gov. Exs. 201 at 13:14-13:21; 204 at 13:12-13:18; 309 at 00:10-:0030; 340 at 2:38 -2:59. Samsel walked onto the restricted grounds and toward the officers on the Pennsylvania Avenue Walkway, marking the first breach of the restricted perimeter. Grant followed closely behind Samsel, excitedly jumping up and down and waving the crowd towards the second barrier on the Pennsylvania Avenue Walkway. *Id.; see also* 302 at 00:00 -00:07. Randolph followed Samsel's and Grant's lead, stepped over the

downed bike rack barricades, and made his way to the front of the large crowd that had then begun to gather at the second barricade on Pennsylvania Avenue walkway. Gov. Ex. 340 at 3:10. Randolph stated he believed the rioters who charged the fence after Johnson's exhortations were members of the Proud Boys. Gov. Ex. 523 at 19:15. While believing the crowd included members of a violent street-fighting gang, Randolph enthusiastically joined in charging the barricade. In the post-arrest interview, Randolph admitted that he was part of the crowd at Peace Circle and that he knew there were only about three police officers defending the other side of the second barrier. Randolph stated that "they had no chance" in the face of the rioters' attack.



*Government Exhibit 340 at 3:11: Randolph (circled in purple) just after he stepped over the downed bike rack barricade (noted with red arrow)*

In response to the breach, the officers descended the stairs to man the barricade on the Pennsylvania Avenue Walkway. ECF 317 at 113:10–19; Gov. Ex. 201 at 13:00–13:20. Sergeant Lively joined Officers Edwards and Cruz and the three other officers on the Pennsylvania Avenue Walkway barricade. ECF 315 at 78:23–80:1; *see also* Gov. Ex. 302 at 00:05. As Randolph headed

toward them, Samsel and Grant approached the officers at the second barricade. Johnson directed

his taunts at the officers, yelling through the megaphone "We pay your bills!" and "You back the

fuck off!" Gov. Ex. 302 at 0:00 – 00:15.

Randolph followed Samsel and Grant to the second barricade, which officers held onto as

Samsel and Grant shook and pushed the barricade while it was still on the ground.   As the officers

ordered them to stop, Randolph began to forcibly push and pull on the bike rack barricade directly

across from Officer Edwards. Gov. Exhs. 302 at 00:51 – 00:57, 308 at 00:37.



*Government Exhibit 302 at 00:56: Randolph (purple circle) pushing bike racks with*
*Samsel (red circle) directly across from Officer Edwards (yellow arrow)*

Samsel and Randolph then lifted the portion of the bike rack barricade across from Officer

Edwards off the ground, while Grant and Johnson lifted the portion across from Sergeant Lively

and Officer Cruz. Gov. Exs. 302 at 00:55-1:00, 308 at 00:39-00:45. Blythe moved forward and

grabbed the bike racks in between Johnson and Grant, and the five defendants together drove the

metal bike rack barricades into the officers. Gov. Exs. 302 at 00:55-1:02; 308 at 00:37-00:47; 309

at 1:25-1:31.



*Government Exhibit 302 at 00:56 Grant (blue circle), Blythe (green circle), Johnson (yellow circle), Samsel (red circle) and Randolph (purple circle) pushing the barricade at the police line*

As they drove the bike rack barricade at the police line, Officer Edwards was struck in the face with one of the bike racks. ECF 345 at 9 (citing ECF 317 at 42:7–43:12; *see also* Gov. Ex. 308A 0:25–37). The force threw her back and caused her to slam her head twice: first against a metal handrail, then against the steps. *Id.* (citing Gov. Ex. 308 at 0:44–46; ECF 317 at 44:12–45:10). She lost consciousness and suffered a concussion. ECF 345 at 22.[3] Another rioter started to help Officer Edwards get back on her feet.[4] Once on her feet, Officer Edwards testified that she

---

[3] Officer Edwards testified, "the last thing that I really remember at that time was hearing that loud clang of my jaw hitting the metal handrail." ECF 317 at 42:15 – 42:17. Officer Edwards lost consciousness when her jaw hit the handrail, so she did not remember her head hitting the stairs. *Id* at 44:11 – 44:15.

[4] Samsel walked around the barricade and joined the other rioter who had already started to help

9

was "incredibly confused," "dazed" and could not focus. ECF 317 at 44:25-45:5. *See also id*. at 47 ("The lights were on but no one was home…."). The next thing she remembered was her fellow officer telling her that they had to go, and "adrenaline, survival" kicked in. *Id*. at 45.

 Randolph recounted this moment to an undercover agent on April 13, 2023. Go. Exh. 523 19:28 -19:48. Randolph described seeing "a lady cop get slammed." *Id.* He said that "she had to get a concussion" because her head bounced off one of the metal handrails on the steps behind her and she "just lay there in the fetal position." *Id.*



***Government Exhibit 308 at 42 seconds: Randolph (circled in purple) pushing Officer Edwards (yellow arrow) backwards***

Officer Edwards to her feet. Gov. Exh. 309 at 1:29 to 1:36.



***Government Exhibit 308A: Officer Edwards (yellow arrow) striking her head on the handrail as Randolph (purple circle) and Samsel (red circle) continue to push the bike rack barrier forward***

Officer Edwards was later transported to the hospital by ambulance after appearing groggy and incoherent and then passing out a second time in front of a coworker. ECF 345 at 22. At the hospital, Officer Edwards described the pain she felt as "excruciating." ECF 345 at 22.[5] This pain would last several weeks and require Officer Edwards to undergo physical therapy. ECF 345 at 22-23.

It took until April 2021 for her to regain her balance and be able to drive a car. ECF 317 at 60:21-60:25. From January through April, she could only get up for 30 minutes or less until she

---

[5] Officer Edwards described the pain as "absolutely excruciating…. I had to clamp my mouth shut to try to keep from … either screaming, throwing up or crying. It was just horrible. It felt like somebody was taking my head and trying to, like, tear it apart. I can't describe to you the pain that was … emanating from the back of my head." ECF 317 at 58:10 – 58:16. She explained that the pain was coming from the spot where her head had hit the stairs. *Id.* at 58:23 – 59:5.

would get bouts of vertigo and vomit. *Id*. at 61:3 – 61:4. She was on desk duty starting in May 2021, and stayed on desk duty for a year and a half. *Id.* at 63:7 - 64:13. She described it as "demoralizing," because desk duty was "not being a police officer." *Id.* at 63:22 – 64:4. In November 2021, she suffered an episode where she lost consciousness and was taken by ambulance to the hospital again. *Id*. at 64:16 – 64:20. She returned to full duty in July 2022. *Id.* at 64:6 – 64:13. She remains on medication for her head injury, but she still gets migraines. *Id.* at 62:17– 63:5; 65:3 – 65:22 ("I would say a bad month I would have about one [migraine] a week and on a good month, I'd have one a month.") The migraines last from four hours to two days. *Id.* at 65:15 – 65:17.

Officer Cruz and Sergeant Lively were driven several feet backwards by the bike rack barricade until the back of their bodies ran into the stairwell behind them. Gov. Exs. 302 at 1:01; 309 at 1:26-1:29. Officer Cruz testified that he feared being trampled by the crowd during that moment. ECF 345 at 28 (citing ECF 317 at 120:13–121:7).

As Officer Edwards lay injured on the ground right across from Randolph, he chose to jump over the barricade, and assault Officer Cruz. Gov. Exs. 302 1:02 – 1:15, 308 at 00:49. As Officer Cruz tried to defend himself, Sergeant Lively fought to separate Randolph from Officer Cruz, but Randolph grabbed Lively's arm and pulled it down over Cruz's head, trapping him in a headlock. Officer Cruz tried to break free, but Grant and Blythe then joined in and tried to pull Randolph towards the other rioters. *Id.*; ECF 317 at 128:23 – 128:24. Officer Cruz testified that he "felt like I was -- I didn't want to get like pulled into the crowd; that's why I was trying to break free." ECF 317 at 129:5 – 129:7. Only another officer's intervention, by punching Grant, allowed

Officer Cruz to escape from Randolph's grasp. Gov Ex. 302 at 1:15.



***Government Exhibit 308 at 49 seconds: Randolph (circled in purple) after jumping over the barricade and grabbing onto Officer Cruz while Johnson (yellow circle) continues to pull away the barrier and Grant (blue circle) and Blythe (green circle) prepare to join the attack***



***Government Exhibit 302 at 1:12: Randolph (purple circle) grabs onto Officer Cruz and Sergeant Lively's arm while being pulled towards crowd by Grant (blue circle) and Blythe (green circle)***

Even after becoming separated from Officer Cruz, Randolph continued forward and tried to run past the officers towards the Capitol. Sergeant Lively grabbed a hold of Randolph and tried to prevent his advance. Gov. Exh. 308 at 1:01 – 1:12.



***Government Exhibit 308 at 1:02: Randolph (purple circle) attempted to run past police and is
stopped by Sergeant Lively while Samsel (red "Make America Great Again" hat) watched***

By this point, the barricades were down, and the officers outmanned. The defendants and
the rest of the rioters quickly overwhelmed the police line, and the USCP officers retreated up the
Pennsylvania Avenue walkway towards the Capitol building. The rioters, including the five
defendants, charged towards the Capitol building on the Pennsylvania Avenue walkway. Gov Exs.
302, 305, 306, 308, 309, 310, 311, 331.

USCP officers, who were eventually reinforced by Metropolitan Police Department
("MPD") officers, were able to establish a new defensive line at the West Front. Rioters fought
against the police line in this area to attempt to gain access to the Capitol building. Officers
attempted to disperse and defend against the crowd with non-lethal force. *See generally* Gov. Exh.
101. Despite police efforts to disperse the crowd and defend the Capitol, rioters eventually broke
through the line and occupied the Capitol. Randolph stayed on the Capitol grounds for hours and
eventually climbed to the Upper West Terrace. Gov. Exh. 327. From this location, Randolph

watched as the crowd attacked officers in the in the Lower West Terrace tunnel—the center of some of the worst violence on January 6. During the conversation with the undercover agent on April 13, 2021, Randolph bragged about being involved in the riot, telling the agent that he was "right in it" and stood above the people throwing things at the police in "the archway." He described the coordinated heave-ho pushes by the rioters. Based on his description, it is clear he watched the violence at the tunnel. When recounting those observations, Randolph said "it was fucking fun."



*Government Exhibit 327 at 3 seconds: Randolph (circled in purple) on the Senate side scaffolding connected to the Upper West Terrace*

### *Randolph's Additional Statements*

### A. Podcast Appearance[6]

During another conversation with an undercover agent on April 18, 2021, Randolph stated he was on a German podcast titled "The Patriot." Randolph stated the focus of the podcast was "Why I am the way I am politically." Randolph stated he met the reporter after the events of January 6 at the Capitol. Randolph bragged "he might become famous . . . it was fun." The beginning of the podcast sounds like it was recorded on January 6, 2021 with a crowd in the background chanting "USA! USA!"   Randolph then stated, "They're saying it's their house, and it is, they paid for it, they're taxpayers, it is their house." Later in the podcast, Randolph described being upset on the drive home from January 6 because he "felt defeated" and that he knew what happened was wrong and because he said the media would portray the events of January 6 as "monsters attacking the Capitol and that's not really how it was." He also spread false claims on the podcast that a member of Antifa was responsible for antagonizing people to push the barriers.

### B. Custodial Interview

After Randolph was arrested on April 20, 2021, he spoke to FBI agents about the events of January 6, 2021. Randolph immediately expressed no remorse for his actions on January 6, 2021. After being read Miranda warnings, Randolph stated "I don't feel like I've done anything criminal, so I'll talk to you."

Randolph lied to the FBI during his custodial interview. In Randolph's version of events, he tried to help Officer Edwards, but he got punched by another officer. Randolph even falsely

---

[6] https://www.zeit.de/politik/ausland/2021-12/die-patrioten-podcast

claimed that he picked up Officer Edwards and told her to get out of the way because the crowd might hurt her. Later in his statement, Randolph alleged Officer Cruz and Sergeant Lively pulled him over the fence and continually punched him until other members of the crowd pulled him away from the officers. These are all lies. Randolph made no efforts to assist Officer Edwards, and in reality, Randolph leapt over the barricade, made a beeline towards Officer Cruz and assaulted Officer Cruz, at which point Sergeant Lively intervened.

Even after being confronted with video evidence of his assaults, Randolph doubled down on his lies, again claiming that he was punched while trying to rescue "the lady cop." Eventually Randolph conceded that he crossed a barricade, but he tried to justify this by claiming he only crossed a barricade that had already fallen. Later, he stated he had no intent to cross the barrier, just to shake it, because he knew he could get in trouble for crossing the barrier. When asked why he wanted to shake the barrier, he said because everyone else was doing it. Randolph downplayed his actions, stating, "I can't be held solely responsible for that."

Perhaps recognizing his inconsistencies, Randolph next attempted to shift blame to the officers. He said his "main goal" was to help the female police officer on the ground, but the other officers "grabbed [him] and dragged [him] over that barrier." Randolph alleged the "cops on the left beat . . . the shit out of me." He stated he was trying to get his hands up and that he never touched them, but that they were "uppercutting" him in the face. This is belied by the video evidence in which Randolph lunged at the officers unprovoked, and the officers grappled with him to try and gain control.

Randolph told the agents he immediately left after seeing an injured rioter on the West

18

Front. This is not true. In fact, consistent with the evidence, Randolph later admitted to getting closer to the building and observing the fighting between police and rioters near the "tunnel" on the Lower West Terrace.

After the interview Randolph grew upset and frustrated saying, "Can't ya'll just, like we accepted defeat already, we lost, Joe Biden is president, yay." Randolph continued to downplay the seriousness of his crimes, saying "there's more important shit to be doing than this. I ain't hurting nobody. I'm gonna plead not guilty, I didn't do anything wrong. I pushed a wall. Do you think I did anything wrong?"

### C. Jail Calls

Randolph was detained for a period of time in his home District. Randolph made a call from a detention facility in Kentucky. During that call, he downplayed his actions by saying that the video showed him "shaking the barricades." He did acknowledge, however, that he was responsible for hurting Officer Edwards.

During another call, however, Randolph downplayed his role, saying "I got caught up in the heat of the moment, everyone cheering and chanting and screaming . . . it washed over me and I grabbed the fence and started shaking with everybody. That lady just fell and hit her head. It's just a disaster, I feel so bad." Randolph was one of the first people to start forcefully pushing and pulling on the barricade. Officer Edwards didn't just fall over from Randolph "shaking" a fence. Randolph and Samsel lifted the barricade and drove it into her with such force that she was struck in the face with it and knocked off her feet.

During another call, Randolph again showed a lack of remorse saying "I don't deserve a

19

lot of time, I didn't do nothing too bad."

## III.    THE CHARGES AND CONVICTION

On February 15, 2023, a federal grand jury returned a fourth superseding indictment charging Randolph with ten counts, including, Count One, Obstructing Officers during a Civil Disorder, 18 U.S.C. § 231(a)(3), Count Two, Assaulting, Resisting or Impeding Certain Officers Using a Deadly or Dangerous Weapon and Inflicting Bodily Injury, 18 U.S.C. §§ 111(a)(1) and (b), Count Four, Assaulting, Resisting or Impeding Certain Officers, 18 U.S.C. §§ 111(a)(1) and Count Nine, Act of Physical Violence in a Capitol Building or Grounds, 40 U.S.C. § 5104(e)(2)(F). On February 2, 2024, Randolph was convicted of those offenses following a bench trial. Randolph now faces sentencing for these convictions.

## IV.    STATUTORY PENALTIES

As noted in the U.S. Probation Office's Presentence Report, Randolph faces up to 5 years of imprisonment for Count One, 20 years of imprisonment under Count Two, and 8 years of imprisonment under Count Four and a term of supervised release of not more than three years, a fine up to $250,000, restitution, and mandatory special assessments of $100.00 for each felony conviction. He also faces up to 6 months imprisonment for Count Nine.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.

The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The Government agrees with the offense level (31) and Guidelines range (108-135 months' imprisonment) in the draft PSR.   However, the draft PSR mistakenly groups Counts One and Two pursuant to U.S.S.G. § 3D1.2(b), based on the counts having the same victim.   PSR ¶ 83. The counts involve different victims: Officer Edwards is the sole victim in Count Two, but as identified in the Fourth Superseding Indictment and the Court's Findings of Fact and Conclusions of Law, Randolph's victims for Count One—the officers whom Randolph obstructed, impeded, or interfered with when overrunning the police line near the Peace Circle—included Sgt. Lively,[7] Officer Cruz, and "other officers who formed the police line at the second barricade." ECF No. 345 at 15. Nevertheless, Counts One and Two do group pursuant to U.S.S.G. § 3D1.2(c) because Count Two (the assault of Officer Edwards with a metal crowd control barrier) embodies conduct that is treated as a specific offense characteristic in the guideline applicable to Count One (specifically, the four-level enhancement for use of a dangerous weapon in U.S.S.G. § 2A2.2(b)(1)(B)).

Count Four does not group pursuant to U.S.S.G. § 3D1.2 "as it represents a separate and distinct harm." PSR ¶ 84. Officer Cruz is the sole victim for Group Two.

---

[7] As noted above, Johnson and Grant lifted the portion of the metal bike rack barricade (which weighed 25-50 pounds) off the ground across from Sergeant Lively and Officer Cruz and used the barricade to drive both of the officers back several feet until the officers' backs hit the stairwell.

The Government's Guideline Calculation is as follows:

<u>Count One: 18 U.S.C. § 231(a)(3)</u>

| U.S.S.G. § 2A2.2(a)[8] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 3A1.2(b) | Official Victim | <u>+6</u> |
| | **Total** | **24** |

<u>Count Two: 18 U.S.C. § 111(b)</u>

| U.S.S.G. § 2A2.2(a)[9] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(3)(B) | Serious Bodily Injury | +5 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(7) | §111(b) Conviction | +2 |
| U.S.S.G. § 3A1.2(b) | Official Victim | <u>+6</u> |
| | **Total** | **31** |

<u>Count Four: 18 U.S.C. § 111(a)(1)</u>

| U.S.S.G. § 2A2.2 | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3Al.3 | Restraint of Victim | <u>+2</u> |
| | **Total** | **22**[10] |

---

[8] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

[9] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

[10] Under U.S.S.G. § 3D1.4(c) any Group that is 9 levels less serious than the Group with the highest offense level is disregarded. Since the assault on Officer Edwards was so brutal, and because she was so severely injured, the grouping rules effectively nullify Randolph's assault on Officer Cruz. This is still the case, even though Randolph's assault of Officer Cruz is aggravated by the fact that he restrained Officer Cruz in the course the assault.

Counts One and Two group pursuant to U.S.S.G. § 3D1.2(c). Pursuant to U.S.S.G. § 3D1.3(a), the offense level applicable to the group is the offense level "for the most serious of the counts comprising the Group, i.e., the highest offense level of the counts in the Group."  Here, Count Two, the assault of Officer Edwards with a dangerous weapon and causing bodily injury, has the highest offense level: 31. Thus, the offense level for the group is 31.

Group Two is nine points below Group One so it does not factor into the combined offense level. U.S.S.G. § 3D1.4(c).[11]

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 110. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, 31, Randolph's Guidelines imprisonment range is 108 to 135 months' imprisonment.

### *Inapplicability of U.S.S.G. § 4C1.1*

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply in this case because (1) Randolph used violence and credible threats of violence in connection with the offenses, in contravention of § 4C1.1(a)(3); and (4) Randolph possessed a

---

[11] The Background to U.S.S.G. § 3D1.4 contemplates this scenario stating "If there are several groups and the most serious offense is considerably more serious than all of the others, there will be no increase in the offense level resulting from the additional counts. Ordinarily, the court will have latitude to impose added punishment by sentencing toward the upper end of the range authorized for the most serious offense."

dangerous weapon (the heavy metal barricade) in connection with the offenses, in contravention of § 4C1.1(a)(7).

### *A Two-Level Upward Enhancement for Restraint of a Victim Applies to Randolph's Assault of Officer Cruz*

Chapter 3 of the Guidelines provides for a two-level, victim-related upward enhancement "[i]f a victim was physically restrained in the course of the offense." U.S.S.G. § 3Al.3. Application Note 1 to U.S.S.G. § 3Al.3 clarifies that the applicable definition of "physically restrained" is found in the Commentary to U.S.S.G. § lBl.1: "'Physically restrained' means the forcible restraint of the victim such as by being tied, bound, or locked up." U.S.S.G. § lBl.1, cmt. n.l(L). Courts, including the D.C. Circuit, have consistently held that the victim "being tied, bound, or locked up" is not a requirement for physical restraint, but instead a non-exhaustive list of examples of physical restraint. *United States v. Drew,* 200 F.3d 871, 880 (D.C. Cir. 2000) ("the use of the modifier 'such as' in the definition of 'physical restraint' found in § 1 B 1.1 . . . indicates that the illustrations of physical restraint are listed by way of example rather than limitation") (quoting *United States v. Anglin,* 169 F.3d 154, 163 (2d Cir.1999)); *see also United States v. Bell,* 947 F.3d 49, 55 (3d Cir. 2020) ("[W]e, along with many of our sister circuits, have held that the three examples provided in the definition of physically restrained are not an exhaustive list, but rather only examples of the types of conduct that fall within the meaning of the term [physically restrained].") (collecting cases from the First, Second, Third, Fourth, Fifth, Nineth, and D.C. Circuits).

Circuit courts have varying approaches to determining the applicability of the physical restraint enhancement under the Guidelines. *See United States v. Taylor,* 961 F.3d 68, 78 (2d Cir. 2020) (discussing the approaches taken by the Second, Third, Seventh and Ninth Circuits in cases

24

involving two-level enhancements for use of physical restraint in robberies). The Third Circuit developed an approach incorporating various considerations adopted by the other Circuits, including a consideration addressed by the D.C. Circuit, which itself currently has a dearth of caselaw on physical restraint under the Guidelines. *Bell,* 947 F.3d at 56 ("[W]e discern five broad factors that the other circuits have used to evaluate whether the enhancement should be applied and that we, after consideration, adopt here"). The five factors identified by the Third Circuit are:

1. Use of physical force;

2. Exerting control over the victim;

3. Providing the victim with no alternative but compliance;

4. Focusing on the victim for some period of time; and

5. Placement in a confined space.

*Bell,* 947 F.3d at 56.[12] Each factor will be addressed below.[13]

## 1. Randolph used physical force against Officer Cruz.

---

[12] The Third Circuit in *Bell* addressed a two-level enhancement for physical restraint pursuant to U.S.S.G. § 2B3.l(b)(4)(B) which reads, "[I]f any person was physically restrained to facilitate commission of the [robbery] offense or to facilitate escape, increase by 2 levels." U.S.S.G. § 2B3.l(b)(4)(B). This enhancement varies a bit from§ 3Al.3, which applies "[i]f a victim was physically restrained in the course of the offense." U.S.S.G. § 3Al.3. The Chapter 2 Guideline imposes an additional requirement that the restraint must be imposed "to facilitate commission of the offense [of robbery] or to facilitate escape." *Bell,* 947 F.3d at 60. However, since the Chapter 2 enhancement in *Bell* also refers to "physically restrained" as defined in U.S.S.G. § lB 1.1 *(see Bell,* 947 F.3d at 54--55), *Bell* and similar cases interpret the meaning of "physically restrained" as it is used in § 3Al.3.

[13] Judge Mehta relied on the *Bell* factors in deciding to apply the § 3Al .3 enhancement in *United States. v. Thomas Webster,* 21-cr-208 (APM), a January 6 assault on a federal officer case in which the defendant tackled the victim officer to the ground and attempted to strip the officer of his gas mask while he was enveloped by the mob.

The D.C. Circuit Court has found that "physical restraint requires the defendant to restrain the victim through bodily contact or to confine the victim in some way." *Drew,* 200 F.3d at 880 (finding no physical restraint pursuant to U.S.S.G. § 3Al.3 where the defendant ordered his victim to leave her bedroom and walk downstairs at gunpoint, because "[t]he required restraint must, as the language plainly recites, be physical") (citing *United States v. Harris,* 959 F.2d 246, 265 (D.C.Cir.1992) *abrogated on other grounds by United States v. Stewart,* 246 F.3d 728 (D.C. Cir. 2001)).

Here, Randolph made direct bodily contact with Officer Cruz by grabbing the officer's left arm and shoulder and holding onto Officer Cruz. As Sergeant Lively attempted to separate Randolph from Officer Cruz, Randolph grabbed ahold of Sergeant Lively's arm pulled Sergeant Lively's arm over top of Officer Cruz's head, and thereby trapped Officer Cruz in a headlock.

Similar conduct has been found by courts in January 6 cases to involve physical restraint under the Guidelines. For instance, in *United States v. Young,* 21-cr-291 (ABJ) the court in applying the enhancement under U.S.S.G. § 3Al.3 found that when the defendant "held Officer Fanone's left wrist in his right hand and pulled the officer's arm away from his body . . . He used his physical strength and force to exert control over the officer's body to restrict the officer's movements, to hold him back, to prevent him from using that arm." *Young* Sen. Transcript at 9. In that case, the defendant grabbed a hold of Officer Fanone's arm while he was pulled into the crowd outside of the lower west terrace tunnel. *Id.* at 25. Here, Randolph grabbed ahold of Officer Cruz, and later Sergeant Lively, and trapped Officer Cruz using his strength to exert control over Cruz and restrict his movement, rendering Officer Cruz helpless to the violent whims of the crowd

around him.

### 2. Randolph exerted control over Officer Cruz.

Consistent with the definition of "restrained" and examples of being physically restrained provided in the Guidelines ("being tied, bound or locked up"), a defendant should be deemed to have engaged in actions that restrict a victim's freedom of movement in some manner." *Bell,* 947 F.3d at 57; *see also Taylor,* 961 F.3d at 78 ("'Restraint' is principally defined as 'to hold back; to check; to hold from action, proceeding, or advancing'") (internal citations omitted); *United States v. Foppe,* 993 F.2d 1444, 1452-53 (9th Cir. 1993) ("The dictionary defines 'restraint' as (1) the act of holding back from some activity or (2) by means of force, an act that checks free activity or otherwise controls ... 'Forcible' means effected by the use of force") (internal citations omitted). *See also id.* (defendant forcibly restrained two women when he held up a bank by dragging one woman by the neck to a teller station while pushing a hairbrush into her back (pretending it was a gun), and he grabbed another woman, a customer service representative, as well).

Here, when Randolph grabbed Officer Cruz, and trapped Cruz in a headlock by grabbing Sergeant Lively's arm, he prevented Officer Cruz from having control over his utility belt. Sergeant Lively testified that he was concerned during this attack that Cruz might become incapacitated and people in the crowd might seek to take his weapons, such as his "handgun, baton, OC spray." ECF 315 at 118:20 - 118:25. In addition, while Officer Cruz was restrained, he could not assist his fellow officers with maintaining the police line or trying to control or deescalate the outbreak of the riot.

### 3. Randolph provided Officer Cruz with no alternative but compliance.

In *United States v. Rosario,* 7 F.3d 319 (2d Cir. 1993), the Second Circuit affirmed the application of § 3A1.3 where the defendant had stood on his victim's throat (pinning him to the ground by his neck) while stealing the victim's wallet and keys, and the victim "could do nothing about [his] situation because of the physical restraint." *Id*. at 320-21 (internal citations omitted).

Officer Cruz testified that maintaining a line with other police officers was important in civil disturbance situations to avoid being "separated" or "pulled into a crowd." ECF 317 at 102:22 – 103:7. While discussing the assault itself, Officer Cruz described Randolph grabbing a hold of him and how he "felt [himself] getting pushed . . . down and [he] was trying to break free." ECF 317 at 128:23 – 128:24. Officer Cruz went on to say that he "felt like I was -- I didn't want to get like pulled into the crowd; that's why I was trying to break free." ECF 317 at 129:5 – 129:7.

<u>4. The brief duration of the restraint does not preclude application of the enhancement.</u>

Another consideration is the duration of the defendant's restraint of the victim. *Bell,* 947 F.3d at 59. While sustained restraint may militate in favor of applying the enhancement, it is not required. *See, e.g., United States v. Coleman,* 664 F.3d 1047, 1050-51 (6th Cir. 2012) ("We likewise reject [the defendant's] 'sustained focus' requirement"); *United States v. Foppe,* 993 F.2d 1444, 1452-53 (9th Cir. 1993) ("The Guidelines do not distinguish between long and short-term restraint, and neither will we"); *see also United States v. Rowsey,* 431 F. Supp. 2d 903, 907-09 (N.D. Ind. 2006) (finding that the victim of a bank robbery was physically restrained even though the duration of the restraint was only about two minutes, because "[i]t is the fact of restraint-not the duration thereof-that is controlling"). In any event, even under the Third Circuit's analysis, the duration of the restraint is only one factor and should be balanced against the other factors used to

determine whether a victim was "physically restrained" under the Guidelines. *Bell,* 947 F.3d at 56. Also, the Court in *Bell* made clear that "[n]o single factor is dispositive nor does any factor carry more weight than any other factor; rather, district courts should balance all of these factors." *Id.* at 60.

Here, while Randolph's restraint of Officer Cruz was brief, context matters greatly. The restraint occurred moments after the rioters first broke through the outer perimeter of the Capitol grounds and then used a bike rack barricade as a dangerous weapon by lifting and ramming it into the officers until they were nearly overrun.[14] Randolph then immediately leapt over the barricade and forcibly grabbed a hold of Officer Cruz, exposing the officer's utility belt, while hundreds of rioters surrounded Cruz and his fellow officers. Randolph refused to let go and pulled Sergeant Lively's arm, further trapping Officer Cruz in a headlock. Blythe and Grant joined in and pulled on Randolph, creating a very real risk of separating Cruz from his fellow officers and pulling him into a hostile crowd.

<u>5. Randolph placed Officer Cruz in a confined space.</u>

Blocking egress is also considered in determining that a victim was "physically restrained" pursuant to U.S.S.G. § lBl.1. For instance, in *United States v. DeLuca,* the First Circuit found that the victim was "physically restrained" by two of the defendant's co-conspirators where one co-conspirator "pushed [the victim] as he attempted to leave the hallway in which he was being

---

[14] Cruz testified "I was just trying to basically hang on and not get run over. I didn't want to fall and then, you know, have the crowd – you know, I didn't want to get trampled. I was also cognizant of the fact that there were stairs behind me. So I was trying to – I didn't want to get pinned against the stairs." ECF 317 at 119:25 – 120:6.

assaulted and [another co-conspirator], throughout the encounter, stood at the hallway door barring egress by [the victim]," even though the victim was never "tied, bound, or locked up," because "[t]he examples listed in the guideline definition of 'physically restrained' [in U.S.S.G. § lBl.1, comment. (n.l(i))] are merely illustrative ... not exhaustive"). 137 F.3d 24, 39 (1st Cir. 1998).

In addition to grabbing the officer's shoulder and arm, Randolph attacked Cruz in a confined space between the partially downed barricade and the steps and handrail that Cruz was driven into by the initial assault. While Randolph grabbed ahold of Officer Cruz in this area, Sergeant Lively attempted to separate Randolph from Cruz. Randolph then further placed Cruz in a confined space by pulling Sergeant Lively's jacket and arm over top of Officer Cruz's head thereby trapping him in a headlock. Cruz actively tried to escape Randolph's grasp.

### 6. Application of the enhancement punishes conduct that is not inherently part of the offense of conviction.

Application Note 2 for U.S.S.G. § 3Al.3 notes that the restraint-of-a-victim enhancement should not be applied where either "the offense guideline specifically incorporates this factor" or "where the unlawful restraint of a victim is an element of the offense itself *(e.g.,* this adjustment does not apply to offenses covered by §2A4.1 (Kidnapping, Abduction, Unlawful Restraint))." U.S.S.G. § 3Al.3 cmt. n. 2. The Tenth Circuit has indicated that courts should "determine whether the offense *conduct* specifically addressed whether the victim was physically restrained" in determining whether a Guideline enhancement incorporates the victim restraint adjustment. *United States v. Troup,* 426 F. Supp. 3d 1072, 1136 (D.N.M. 2019) (quoting *United States v. Joe,* 696 F.3d 1066, 1071 (10th Cir. 2012) (emphasis in original). Additionally, in order to determine whether "restraint" is an element of the offense, courts look to the statutory definition of the

offense. *United States v. Benitez-Torres,* 73 F. App'x 78 (5th Cir. 2003) (citing *United States v. Gaytan,* 74 F.3d 545, 560 (5th Cir. 1996)). When conducting this inquiry, courts should consider whether "the act of physical restraint "adds to the basic crime." *United States v. Wilson,* 198 F.3d 467, 472-73 (4th Cir. 1999) (quoting *United States v. Mikalajunas,* 936 F.2d 153, 156 (4th Cir.1989)).

Here, the offense guideline for the 18 U.S.C. § 111 offense (§ 2A2.2) does not specifically incorporate physical restraint. The specific offense characteristics for § 2A2.2, such as the enhancement for bodily injury sustained by the victim, do not necessarily involve conduct constituting physical restraint and can appropriately be applied in tandem with the victim restraint adjustment in§ 3Al.3. *See United States v. Davis,* No. 20-30438, 2022 WL 226000, at *2 (5th Cir. Jan. 24, 2022), *cert. denied,* 142 S. Ct. 2767 (2022) (rejecting defendant's contention that the serious bodily injury enhancement in U.S.S.G. § 2A2.2(b)(3)(B) incorporates physical restraint as a factor and noting that the Fifth Circuit has previously upheld application of the victim restraint adjustment under§ 3Al.3 when the bodily injury enhancement applied.).

Additionally, unlawful restraint of a victim is not an element of a Section 111 (a) violation. Section 111(a) criminalizes "forcibly assault[ing], resist[ing], oppos[ing], imped[ing], intimidat[ing], or interfer[ing] with" an officer while he is engaged in the performance of official duties. Not all assaults include physically restraining a victim. As noted above, restraint is principally defined as "to hold back; to check; to hold from action, proceeding, or advancing." *Taylor,* 961 F.3d at 78. Hence it is clear that while assault involves some force, it does not necessarily involve restraint. Physical force is distinct from qualifying physical *"restraint." Id.* at

78-79 (citing *Rosario,* 7 F.3d at 321 ("[M]ere physical contact with the victim does not inevitably amount to physical restraint")). For instance, in *United States v. Wilson,* the Fourth Circuit upheld the two-level physical restraint enhancement for a carjacking, noting that physical restraint was not an element in all robberies or the other specific offenses characteristics. 198 F.3d at 472 (4th Cir. 1999). By contrast, the Court explained that the restraint adjustment was not applicable to a conviction for murder, because ""[e]very murder involves the ultimate restraint[, and s]uch terminal restraint is simply an element of the crime of homicide." *Id.* (quoting *Mikalajunas,* 936 F.2d at 156).

Here, Randolph purposely grabbed Officer Cruz and then trapped him in a headlock using Sergeant Lively's arm. Officer Cruz feared being pulled into crowd. Again, this was the same crowd, that moments before, Cruz feared would trample him. Because of this fear, Cruz was actively trying to escape Randolph's grasp. This is meaningfully different from a typical assault that the guidelines account for by providing an enhancement for such restraint. Accordingly, the Chapter 3 adjustment for restraint of a victim should apply in the instant case.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Randolph's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United

States into a Constitutional crisis. Randolph participated in the first breach of the restricted perimeter and first act of violence against Capitol Police, seriously injuring a Capitol Police Officer, and opening the floodgates for thousands of rioters that followed. Even after assaulting Officer Edwards, and knowing that she had been seriously injured, Randolph chose to engage in a second assault on Officer Cruz.   He physically restrained Officer Cruz, thereby placing the officer at risk for even greater harm. Randolph stayed at the Capitol for hours, climbed to the Upper West Terrace, watched as violence continued at the entrance to the tunnel, and bragged about his experience afterwards. The nature and circumstances of Randolph's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 135 months of incarceration.

### B.  The History and Characteristics of the Defendant

Randolph is 34 years old and lives in Kentucky. He is a high school graduate and a certified nursing assistant. The defendant reportedly has a sporadic employment history, most recently as an arborist for a tree service. Randolph has no Criminal History points; however, he does have a minor criminal history. In 2011, he was charged with Public Intoxication and Resisting Arrest and sentenced to fines and court costs on the public intoxication charge and 30 days of suspended incarceration and probation for the resisting arrest charge. While Randolph has reported difficult parts of his childhood, up until January 6, 2021, he had managed to generally stay out of trouble and attain marketable skills. His personal and family history does not warrant a downward variance because they are in no way related to the crimes he committed. The PSR does not contemplate a downward variance based on Randolph's history and characteristics. PSR ¶ 186.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a significant sentence of incarceration. Randolph's criminal conduct on January 6 was the epitome of disrespect for the law. *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.") Randolph played no small role in this attack. In fact, he and his co-defendants took the first steps to turn the protest into a violent, massive riot at the seat of Congress, which eventually halted the certification of the electoral college vote, threatened the peaceful transfer of power, and endangered and injured numerous police officers, including Officer Edwards. Randolph intended these consequences and their gravity could not be more serious.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[15] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

---

[15] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

34

*Specific Deterrence*

The need for the sentence to provide specific deterrence for this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, Randolph expressed no remorse for his conduct on January 6, 2021 until he was briefly in pretrial detention. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). To the contrary, months after his crimes, Randolph bragged about his conduct and said it had been "fun." Even after his arrest, instead of expressing remorse, he lied about his conduct to the FBI, even though he knew that he had committed crimes and had injured Officer Edwards severely. He falsely claimed that he had been trying to help Officer Edwards, when he knew he had done nothing of the sort. And he flatly denied assaulting Officer Cruz, claiming that the officers had attacked him. Even during his interview with probation, Randolph did not make any expression of remorse. Given this, the Court should not weigh heavily any expression of remorse at sentencing.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United*

*States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*,

671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[16]

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[17] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

---

[16] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[17] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

In *United States v. Christopher Quaglin*, 21-cr-00040 (TNM), Judge McFadden sentenced the defendant to 144 months of incarceration followed by two years of supervised release and $2000 in restitution for violations of 18 U.S.C. §§ 111(a), 111(b), 1512(c)(2),[18] and 231, among other statutes, for which he faced a recommended Guidelines range of 168 to 210 months. The defendant in *Quaglin* was in the initial group of rioters who stormed the Capitol at the Peace Circle and assaulted several officers on the West Front by choking one officer to the ground, and by pulling a bike rack away from an officer and then ramming it into a line of more than a dozen officers. The defendant also attacked officers in the tunnel by pulling a shield away from an officer and spraying chemical irritants in the officers' faces. The defendant came prepared for the riot wearing tactical gear and encouraged others to do the same. After January 6, he continued to boast and brag about his conduct, both blaming officers for the riot while simultaneously taking pride in his actions and conduct.

Similar to the defendant in *Quaglin*, Randolph was involved in the initial breach and storming of the Capitol grounds. Randolph instigated the forcible pushing and pulling of the bike rack barricade directly across from Officer Edwards and then lifted the barricade with his codefendants and pushed it into the police line. This is similar to the conduct of *Quaglin* on the west front. Unlike *Quaglin* however, Randolph's conduct resulted in the serious bodily injury of

---

[18] Randolph was acquitted of Count Ten, charging him with violating 18 U.S.C. § 1512(c)(2), but the government is not asking this Court to consider Randolph's acquitted conduct in fashioning an appropriate sentence. *Quaglin* remains a suitable case for comparison notwithstanding Quaglin's conviction of Section 1512(c)(2). In addition to the similarities in conduct noted above, Quaglin's Section 1512(c)(2) conviction did not drive Quaglin's offense level and had only a minor impact on Quaglin's recommended Guidelines range.

Officer Edwards when he and Samsel forcibly struck her in the face with the bike rack and caused her to fly backward, strike her jaw on the handrail and the back of her head on the steps below. Randolph knew Officer Edwards was seriously hurt. He told the undercover agent he saw her head bounce off of the handrail and that she must have gotten a concussion. Officer Edwards confirmed the serious nature of her injuries during her trial testimony. Similar to *Quaglin* choking an officer to the ground, Randolph assaulted Officer Cruz by forcibly grabbing and physically restraining Officer Cruz while Grant and Blythe joined in pulling Randolph and Officer Cruz towards the crowd. Randolph did not join the fighting in the tunnel, nor did he spray chemical irritants at officers, which accounts for the lower recommended sentence for Randolph. Randolph did, however, watch the violence in the tunnel with admiration. When recounting the violence at the tunnel, Randolph told the undercover agent "it was fucking fun." Similar to the defendant in *Quaglin*, Randolph also boasted and bragged about his conduct on January 6 both to undercover agents and appearing on a podcast. Randolph expressed no remorse during his custodial interview and only showed a modicum of empathy for the officer he pummeled after he was in pretrial detention.

In *United States v. Craig Bingert et al.,* 21-cr-00091(RCL), defendant Bingert and his codefendants lifted metal bike rack barricades and pushed them into a line of police officers at the top of the stairs leading to the Upper West Terrace. Bingert and his codefendants struck an officer in the leg with the barricade. Although Bingert only caused a minor injury, Judge Lamberth sentenced him to 96 months of incarceration, three years of supervised release, $2000 restitution and a $3000 fine. After attacking police, Bingert watched the violence at the tunnel for almost an

hour and observed as an officer was dragged into the crowd. Bingert consented to his phone being searched and agents found texts about the official proceeding taking place on January 6, 2021 and screenshots of social media posts about election fraud. Much like Bingert, Randolph joined a group of rioters to push metal bike rack barricades at the police line. Unlike Bingert, Randolph caused a serious head injury to one of the officers then went on to attack and physically restrain a second officer. Also unlike Bingert, Randolph was not convicted of Obstruction of an Official Proceeding. However, after each attacking officers with bike racks, both Bingert and Randolph climbed to the Upper West Terrace to watch the brutal violence against police taking place in and around the Lower West Terrace tunnel.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C.  § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The

MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Randolph was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full

restitution without respect to a defendant's ability to pay.[19]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Randolph to pay $2,000 in restitution for his convictions on Counts One, Two, and Four. This amount fairly reflects Randolph's role in the

---

[19] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

The defendant's convictions subject him to a statutory maximum fine of $250,000 each for Counts One, Three, and Ten and $5000 each for Counts Eight, Nine, Fourteen and Fifteen. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $25,000 to $250,000. U.S.S.G. § 5E1.2(c).

## IX.     CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 135 months of incarceration, three years of supervised release, the mandatory assessment of $100 for each felony conviction and $10 for each class B misdemeanor conviction, $2000.00 restitution to the architect of the Capitol.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:     _s/ Kyle R. Mirabelli_
            Kyle R. Mirabelli
            Assistant United States Attorney
            NY Bar No. 5663166
            U.S. Attorney's Office
            District of Columbia
            Telephone No: (212) 252-7884
            Email Address: kyle.mirabelli@usdoj.gov