UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No. 21-cr-537 (JMC) |
| | : | |
| STEPHEN CHASE RANDOLPH | : | |

**STEPHEN RANDOLPH'S SENTENCING MEMORANDUM**

Stephen Chase Randolph, by and through his undersigned counsel, hereby respectfully submits this sentencing memorandum in advance of his sentencing hearing scheduled for September 19, 2024. As set forth in greater detail below, Mr. Randolph is deserving of leniency and he respectfully requests the Court vary downward and impose a sentence well below the advisory guidelines range.

**I.     MR. RANDOLPH'S PERSONAL HISTORY AND CHARACTERISTICS**

In many ways, Stephen Randolph is not a typical 34-year-old. He maintains a small, tightknit circle of people in his life, and, to this day, he does not have an email account or any social media accounts. Until recently, he did not even have his own phone. In his late 20's and early 30's, he provided around-the-clock, in-home care for his wife's elderly grandmother, Dorothy Hood, seven days per week. He was happy to dedicate his time to her care for nearly seven years because, at his core, that's what Stephen is: a caregiver. He was also honored to provide her care because his wife's family welcomed Stephen into their lives and, for the first time in his life, he belonged to a stable, loving, and secure family. During the time he cared for her, Dorothy became his grandmother, too. The following are pictures of Mr. Randolph with Mrs. Hood:







Mr. Randolph's childhood was filled with neglect and abuse. His mother was not able to provide for his basic needs and she certainly was not able to meet his emotional needs or provide parental support during his formative and developmental years. Mr. Randolph was passed around to live with different family members. When he was six years old, his mother died in a house fire. From the ages of five to 10, he lived with his maternal aunt - a drug abuser - who physically and emotionally abused him. She exploited him for benefits and used him to perform her work.

At 10, he moved in with his grandmother, and for the first time in his young life, he knew that his guardian actually cared for him. His grandmother was poor and their conditions humble, but to finally experience familial love felt like "going from hell to heaven." PSR at ¶ 120. Living with his grandmother is where he first learned how to provide in-home care for an elderly person. His grandmother taught him basics and he assisted as she cared for Mr. Randolph's great-grandmother who had Alzheimer disease and suffered a stroke. Later, after completing one semester of community college, he became a certified nursing assistant and obtained a state

3

certified emergency medical technician. Caregiving comes naturally to Mr. Randolph and is a part of his personality.

In the past four years, Mr. Randolph and his wife's family have suffered tremendous losses.  Mr. Randolph's grandmother passed away in December 2020, from the COVID virus.  Dorothy, his wife's grandmother passed away in April 2021, right before he was arrested and Mr. Randolph was unable to attend her funeral because he was detained.  After caring for Dorothy in her home and living with her for several years, it devastated him that he was not able to be at her service.  And now, just a couple of weeks ago, Mr. Randolph's father-in-law passed away after a battle with cancer.  In many ways, his life has been on hold for three-and-a-half years since his arrest as he has been living on pretrial release with the weight of the uncertain outcome of his case.  Notwithstanding, he has taken positive steps towards his future.  He and his wife were finally married after a long engagement, and he learned the work of an arborist, performing tree services as work is available to him in his community.

Those who know Mr. Randolph best have written letters to the Court to provide more information about who he is as a person.  Attached at Exhibits A to I are letters from family and close friends:

      A. Jeannie Hood Randolph – Mr. Randolph's new wife and partner of 10 years

      B. Wendy Hood – Mr. Randolph's mother-in-law

      C. Joseph Hood – Mr. Randolph's father-in-law who recently passed away

      D. Everett Hood – Mr. Randolph's brother-in-law

      E. Elizabeth Smith – Family friend of 10 years

      F. Jill Cutler – Family friend of 10 years

      G. Reverand Pamela Sims – Family friend of 10 years

      H.  Stella Robertson – Mr. Randolph's wife's maternal grandmother

      I.  Vicki Beldon – Mr. Randolph's great-Aunt

Read together, the letters demonstrate that Mr. Randolph enjoys a reputation as a gentle, kind, caring person. Those who know him cannot conceive that he would engage in assaultive behavior, and there can be no question that his actions for a brief time on January 6, 2021, are aberrant and far outside his character.

Mr. Randolph's great-Aunt, Vicki Beldon, writes, in part, that Mr. Randolph confided to her that he "deeply regrets" his behavior on January 6, 2021, and that the "entire incident was so out of character for him." *See* Exhibit I.  She also writes that

> [Mr. Randolph's] mother had her first child when she was 13 years old. Much too young to be a mother. Mostly, his mother wanted to party and was into drugs. Due to this situation, Stephen had a real hard time growing up. He never had what you would say a "real home" until he moved in with his grandmother and he took on the responsibility of taking care of her. She had cancer and needed a lot of help. He was there at her beckon call. When she passed away, she asked that Stephen oversee all of the funeral arrangements The funeral director told me how considerate and nice he was dealing with her death.

*See id.*

Stella Robertson, Mr. Randolph's grandmother-in-law, describes him as "one of the most soft spoken and kind hearted young men I know." *See* Exhibit H.  Mrs. Robertson similarly describes his difficult childhood and background.  She also writes

> [a]fter Stephen's granny died, Stephen was the caregiver for Dorothy Hood . . . I observed that Stephen was patient and kind in providing for Dorothy, and he became familiar with the Hood family during these years. He attended their church, celebrated holidays and special events with them, and spent many hours in their home. . . . I have observed him as a gentle young man, no threat to anyone. His kindness and care eased the end of life for several elderly grandmothers in his family.

*Id.*

5

She also explains that Mr. Randolph went to Washington D.C. to hear then-President Trump speak and to "enjoy a vacation." *See id.* By the end of 2020 and the beginning of 2021, Dorothy Hood was at the very end of her life; she was over 100 years old, and Mr. Randolph had been providing her in-home care for a significant period of time without a break or a vacation. Going to see Mr. Trump speak in Washinton, D.C. was a once-in-a-lifetime opportunity for him, and his wife, Jeannie, agreed to stay with her grandmother so that he could go. Mr. Randolph travelled to D.C. for a break that his family perceived as much deserved. He had no malicious purpose and had no reason to believe the events of January 6th would play out as they did.

The letters attached at Exhibits A to I are replete with references to Mr. Randolph's good character, his gentle spirit, and his caretaking qualities. His brother-in-law writes that he thinks Mr. Randolph is "an innately good person who's had a life much harder than most." *See* Exhibit D. At Exhibit A, Mr. Randolph's wife writes lovingly about meeting her husband, and his in-laws likewise attest to Mr. Randolph's good character. It is clear they approve of him as a spouse for their daughter. Joseph Hood, his father-in-law, wrote his character letter earlier this year, and he described Mr. Randolph as "one of the most honest, trustworthy young men I know." *See* Exhibit C. To the dismay of Mr. Randolph and the entire Hood family, Joseph recently passed away. Mr. Randolph was helping care for him before he passed away.

If Mr. Randolph could go back in time, he would never have gone to Washington, D.C. that day. He carries a tremendous amount of guilt and regret that he took part – however briefly – in a demonstration that evolved to include violence. His early life was marked by insecurity and instability, but by 2021, he was welcomed into the Hood family, and, for the first time in his life, experiencing a "normal" family. He was grateful to be experiencing love, stability, and security as illustrated by the following photos.





Mr. Randolph is devastated that he will have to sacrifice some amount of time away from his family because of his conduct on January 6. He will come before the Court remorseful and ask for leniency and the chance to get back to his family as soon as possible.

## II.   CIRCUMSTANCES OF THE OFFENSE

On January 5, 2021, Stephen Randolph borrowed his wife's car and drove from Harrodsburg, Kentucky to Washington, D.C. with nothing but a small amount of cash and the clothes on his back. He did not pack extra clothes or tactical gear; he did not bring anything that could be used as a weapon, pepper spray or the like; he did not bring provisions in case of an emergency. Because he's not online or on social media and because he keeps his network of people to a small circle in his rural community, he did not coordinate with others or engage in

7

talk of impending war or disaster. Mr. Randolph had no reason to believe the day's events would unfold as they did. His expectation was that he would listen to Mr. Trump speak and be a participant in a historic – lawful – demonstration of people in support of then-President Trump.

Mr. Randolph ended up in the Peace Circle around noon with a small but growing crowd of people. As the minutes ticked by, more and more people joined the area behind the outermost row of bicycle racks marking the perimeter of the restricted area. As the crowd got bigger, it got louder. More individuals were vocalizing their protest and dissatisfaction. Mr. Randolph was not one of them. At no point on January 6, 2021, was he yelling, shouting, encouraging or otherwise inciting violence. When the outermost perimeter was removed, the crowd advanced to the next row of bicycle racks, Mr. Randolph included. The crowd swelled in size and the shouting and chanting and agitating were reaching fever pitch. Mr. Randolph was not one of the individuals shouting about moving forward, about taking down the barricades, but he clearly got caught up in the mob mentality and joined others who were grabbing onto the bicycle rack to move it. He grabbed onto one part of the linked bicycle racks and began pushing and pulling, joining in the effort to remove the barricades.

The events that may forever define multiple lives happened in a matter of seconds. The linked racks were pushed forward by an entire group of individuals; a male in a black hoodie removed the long, perpendicular post welded to the bottom of the rack that was caught on a stone ledge; the racks went flying forward and Office C.E. fell backwards. Mr. Randolph did not purposely position himself on that specific portion of the rack – it was nearest to where he had been standing. He did not intend for anyone to be injured. He accepts the Court's verdict, but he insists that in those brief seconds he did not intend to or actually use the rack as a weapon, he was not calculating the physics of Officer C.E. falling backward into the railing. When he began

pushing and pulling the rack, the stairs and its attendant rail weren't immediately behind her. There is no question that Mr. Randolph should not have gotten involved by putting his hands on the bicycle rack; however, what ultimately happened was far more extreme than anything he was cognizing at the moment he joined others in the effort to remove the barricades.

After the bicycle rack was knocked down, the crowd rushed onto the Capitol grounds. Mr. Randolph had been knocked down; he got up, and he, too, went onto the Capitol grounds. He was not shouting or chanting, he never went into the Capitol building, and he was not agitated or violent. In fact, later in the afternoon, Mr. Randolph approached Metropolitan Police Department ("MPD") Officers on a set of metal risers to tell them that people below the bleachers were attempting to remove screws from the foundation of the structure. He alerted them and told them they might want to get down. *See* Randolph Exhibit 2, admitted at trial. That conduct is in line with Mr. Randolph's character: earnest and helpful. The following screenshots from Randolph Exhibit 2 show his earnest facial expression and peaceful body language.



9



### III. OBJECTIONS TO THE FINAL PRESENTENCE REPORT

Mr. Randolph has the following unresolved objections to the Final Presentence Report ("PSR").

A. <u>Dangerous Weapon, U.S.S.G. §2A2.2(b)(2)(B)</u>

He objects to four-level enhancement pursuant to U.S.S.G. §2A2.2(b)(2)(B) assessed at paragraph 87. Note one of the Commentary defines a "dangerous weapon" to include "any instrument that is not ordinarily used as a weapon . . . if such instrument is involved in the offense with the intent to commit bodily injury." Mr. Randolph maintains that he did not push or pull the bicycle rack with the intent to cause bodily injury.

B. <u>Serious Bodily Injury, U.S.S.G. §2A2.2(b)(3)(B)</u>

Mr. Randolph also objects to the 5-point enhancement assessed at paragraph 88 in the final PSR for causing "serious bodily injury." Mr. Randolph respectfully urges the Court to apply the three-point enhancement for causing "bodily injury" pursuant to U.S.S.G §2A2.2(b)(3)(A). "Serious bodily injury" is defined at section 1B1.1, Application Note 1(M) as

"injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation."  Shortly after Officer C.E. fell backward, she got up and ran along with other officers and she remained on duty throughout the day. Mr. Randolph asserts that the government has not met its burden of demonstrating that he caused Officer C.E. to sustain "serious bodily injury" as opposed to "bodily injury."  "Bodily injury" is defined as "any significant injury; e.g., an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." U.S.S.G. §1B1.1, Application Note 1(B).  Mr. Randolph respectfully asserts that the "bodily injury" definition is more appropriate in light of the record.

## IV.    SENTENCING ARGUMENT

The advisory guidelines, as calculated in the PSR (31/I) yield a recommended range of imprisonment of 108-135 months; if the Court sustains Mr. Randolph's objections to the PSR, the recommended range of imprisonment will be 57-71 (25/I). Mr. Randolph respectfully asserts that either advisory range exceeds a sentence that is "sufficient, but not greater than necessary" to accomplish the goals of sentencing set forth at 18 U.S.C. §3553(a). Given all the factors unique to Mr. Randolph and his offense, a sentence within the range set forth in the PSR (108-135) is clearly excessive.

Several judges in this district have sentenced individuals convicted of 18 U.S.C. § 111(b) to 40 months or less of incarceration (*U.S. v. David Lee Judd*, 21-cr-40, 32 months; *U.S. v. Aiden Henry Bilyard*, 22-cr-34, 40 months; *U.S. v. Logan Barnhart*, 21-cr-35, 36 months; *U.S. v. Jacob Therres*, 22-cr-381, 40 months; *U.S. v. Grayson Sherrill*, 21-cr-282, 7 months; *U.S. v. Nicholas Brockhoff*, 21-cr-524, 36 months; *U.S. v. Daniel Leydon*, 22-cr-314, 38 months; *U.S. v. Edward

*Rodriguez*, 21-cr-483, 36 months; *U.S. v Thomas Hamner,* 21-cr-689, 30 months; *U.S. v. Farhad Azari,* 23-cr-251, 30 months; *U.S. Dale Huttle*, 22-cr-403, 30 months.

      A sentence well below the advisory guidelines range of incarceration will satisfy the goals of sentencing without being excessive.  Mr. Randolph urges the Court to consider fashioning a sentence that includes both a short period of incarceration combined with alternatives to incarceration such as home confinement and community service.  Mr. Randolph respectfully requests the Court recommend he serve any period of incarceration at FCI Ashland in Kentucky, a Low Security facility near his family in Harrodsburg, Kentucky.  Lastly, he also asks the Court to allow him to surrender to his designated facility rather than be immediately detained following his sentencing hearing.  Probation found that Mr. Randolph is a good candidate for surrender.

      For all the reasons set forth above as well as the arguments he will raise at his sentencing hearing, Mr. Randolph respectfully urges the Court to grant a significant downward variance from the advisory Sentencing Guidelines.

Respectfully submitted,

      /s/ Angela Halim
Angela Halim, Esq.,
3580 Indian Queen Lane
Philadelphia, PA  19129
(215) 300-3229
angiehalim@gmail.com

**CERTIFICATE OF SERVICE**

      I hereby certify that on this date, I electronically filed the foregoing with the Clerk of Court using CM/ECF.  I also certify that the foregoing is being served this day on all counsel of record, via transmission of Notices of Electronic Filing generated by CM/ECF.

                                                  /s/ Angela Halim
                                             Angela Halim, Esq.

Dated:  September 10, 2024